**RAMADA INNS,. INC., a Delaware Corporation, Plaintiff,**

v.

**Jim APPLE, Coker Builders, Inc., Edward L. Young, John Frederick Young, James N. Young, Bruce N. Young, Katherine N. Young, and C–Y–A Company, a Partnership, Defendants.**

Civ. A. No. 78–1907–1.

United States District Court, D. South Carolina, Charleston Division.

Jan. 14, 1980.

Joseph H. McGee, Buist, Moore, Smythe & McGee, Charleston, S. C., Martin Faier, Chicago, Ill., for plaintiff.

Wm. Reynolds Williams, Willco, Hardee, O'Farrell, McLeod, Buyck & Baker, P. A., Florence, S. C., for defendants.

## ORDER

HAWKINS, District Judge.

This action commenced on November 8, 1978 with the filing of the complaint and motion for preliminary injunction by the plaintiff. On December 18, 1978, the motion was heard by the Honorable Sol Blatt, United States District Judge for the District of South Carolina who, at the instance of the plaintiff and with the consent of the defendants, entered his preliminary injunction of December 18, 1978. The complaint alleges that the defendant has violated the Lanham Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.*, and has engaged in unfair methods of competition. Relief is sought in the form of a permanent injunction as well as actual and treble damages. The defendants answered the complaint, denying the essential allegations thereof, and counterclaimed for damages from the plaintiff for an alleged breach of contract. This matter came before me to be heard, without a jury, on December 10, 1979 at Charleston, South Carolina. The presentation of the parties concluded early in the evening of December 11, 1979. In accordance with the provisions of Rule 52(a) of the Federal Rules of Civil Procedure, having considered the testimony, the exhibits, and the stipulations of counsel, I do hereby make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

(1) Plaintiff is the owner of the service marks "Ramada" for hotel and inn services, as well as various other marks for hotel and inn services which include "Ramada", said marks being registered in the United States Patent and Trademark office as registration numbers 686, 471, 718, 705, 741, 047, and 849, 591, all of said marks and registrations being valid and subsisting.

(2) Plaintiff and its licensees and franchisees have used and are using the said marks on and in connection with hotel and inn services in interstate, foreign, and local commerce to identify plaintiff and its business and said marks have acquired a secondary meaning as identifying the plaintiff.

(3) In 1967 the plaintiff entered into a franchise agreement with the Clarendon Properties, Inc., who then constructed and operated a Ramada Inn hotel and restaurant at the southwest intersection of Highway 95 and U.S. 301 in Clarendon County, South Carolina. In October of 1972 the plaintiff consented to the assignment of that franchise agreement from Clarendon Properties, Inc. to Mid-South Motels, Inc. and entered into a franchise and license agreement at that time with Mid-South Motels, Inc., who continued to operate the motel and restaurant near Manning, South Carolina. The terms of the license agreement with Clarendon Properties and with Mid-South Motels are substantially similar and, among other things, called for the payment to the plaintiff of certain royalties, as well as advertising and training fees.

(4) Mid-South Motels, Inc. continued paying to the plaintiff royalties and other fees, until the month of September 1973. From September 1973 forward, the plaintiff received no fees whatsoever, but permitted the continued use of the Ramada Inn trade name and trademarks at the location. In February 1975 the plaintiff notified Mid-South Motels, Inc. that it was revoking the franchise agreement between them, citing as the reason therefor the fact that Hunt-

ington Federal Savings & Loan of West Virginia had instituted an action to foreclose its mortgage on the motel property at Manning.

(5) During the period of time that the property was in receivership, it continued to be operated under the name of Ramada Inn of Manning, using the service marks, trademarks and name Ramada Inn, by Motel Managers, Inc., the Receiver on behalf of Huntington Federal Savings & Loan, until July 11, 1977. Although no royalty payments were made by the Mid-South Motels, Inc. after September 1973, or by Motel Managers, Inc. at any time, and although the plaintiff had apparently revoked its franchise agreement with Mid-South Motels, Inc., the plaintiff instituted no action against Mid-South Motels, Inc. for the purpose of seeking a cessation of its use of the plaintiff's service marks, trademarks and other indicia of origin. As to Motel Managers, Inc. and Huntington Federal Savings and Loan, the plaintiff not only did not take or institute legal action to prohibit their use of its name and marks but also did not notify the Receiver of the Savings and Loan that it wished them to discontinue using its name and marks.

(6) The defendants herein are C–Y–A Company, a partnership, all of the partners of which are the other named defendants. This partnership was formed in the early summer of 1977, the partnership agreement having been executed on July 7, 1977, for the sole purpose of owning and operating the instant motel property near Manning, South Carolina. The defendant Jim Apple is, and has continuously been, the chief executive officer of the partnership. The intent to form the partnership was reached in the early spring of 1977.

(7) At approximately the same time that the discussions among the defendants were going on as to whether or not to form their partnership, Jim Apple engaged in at least one telephone conversation with the corporate headquarters of Ramada Inns, Inc. in Phoenix, Arizona, in which he requested franchising and licensing information. As a result of the first telephone contact initia-ted by Apple, Reading Overstreet, Jr., an account executive with the franchise sales division of the plaintiff, spoke with Apple on the telephone and on April 15, 1977 confirmed the conversation by letter, enclosing a sales brochure as well as a license application.

(8) On June 17, 1977, Huntington Federal Savings and Loan purchased all of the real and personal property of the "Ramada Inn" near Manning, whereupon the Receiver, Mid-South, Inc. did on July 11, 1977, transfer control, dominion, and operation of the motel to the defendants. The defendants received their United States Marshall's deed to the property in late August. Among the real and personal property purchased by the defendants were five billboards along Interstate 95 bearing the Ramada name and logo, one high-rise sign at the motel intersection bearing the name Ramada, as well as a supply of motel paraphernalia, such as match books, maps, lobby signs, restaurant menus, guest checks, folios, soap, trash cans, etc. bearing either the Ramada name, the Ramada logo, or both. Also present immediately in front of the lobby area of the hotel, along U.S. Highway 301, was a large sign bearing the name and logo "Ramada" owned by Heath and Company, a licensee of the plaintiff.

(9) On June 5, 1977, before the defendants had any formal ownership interest in the motel property, an attorney representing the plaintiff wrote Jim Apple demanding that signs and billboards be removed. However, in late July the plaintiff's sales agent, Reading Overstreet, told Apple not to worry about the removal of the signs and billboards. Furthermore, he assisted Apple in the preparation of an application for license and otherwise encouraged the defendants to upgrade the motel property to conform to Ramada standards in an effort to formalize the relationship between the plaintiff and the defendants. Acting partially upon Overstreet's instructions and encouragement, the defendants within the first sixty days of assuming control of the motel property submitted a formal application for their Ramada Inn franchise, paid

the applicable royalty, advertising, and training fees for July ($726.47), and paid to the plaintiff a Fifteen Thousand and 00/100 ($15,000.00) Dollar application fee. Contact with the plaintiff's agent, Overstreet, continued throughout this period and on or about October 31, 1977, Joseph R. Demarest from the plaintiff's quality control division was instructed to inspect the Manning motel property. At that inspection Apple requested that the defendants be provided with the plaintiff's upgrading requirements and also explained to Demarest the fact that the defendants had their own plans to upgrade the property and had set aside in excess of One Hundred Thousand and 00/100 ($100,000.00) Dollars to expend for that purpose. Neither Demarest nor any other agent of the plaintiff ever provided the defendants with a specific set of requirements for upgrading.

(10) On November 7, 1977 John Farrell, head of the quality control division of the plaintiff, circulated a memorandum among the very highest levels of the plaintiff's corporation. The sum and substance of this memorandum was that competing licensees of the plaintiff had made complaints about the Manning motel property's use of the name Ramada in the past, that the "past reputation" thus acquired was such that "no amount of money" would be sufficient to overcome these objections, and that no further consideration should be given to ever licensing the defendant's motel through Ramada. This decision was never made known to the defendants. Nor were the defendants ever informed in any way that the past reputation of the prior owners' operation was even a factor in the plaintiff's corporate decision-making process. The only such factor ever mentioned to the defendants was that before a license would be formally authorized the defendants would have to complete upgrading and improvements of the motel property.

(11) After the decision was made not to license the defendants' operation, the plaintiff, on November 11th, returned to Apple the Seven Hundred Twenty Six and 00/100 ($726.00) Dollars royalty, advertising and training fee check, without explanation. Subsequently, on December 7, 1977, the plaintiff returned Fifteen Thousand and 00/100 ($15,000.00) Dollars to the defendants, representing a refund of the defendants' September Fifteen Thousand and 00/100 ($15,000.00) Dollar check which the plaintiff had previously cashed. In the accompanying letter, Norman D. Thomas, Assistant Vice President for Franchise Administration, requested that the defendants discontinue using the Ramada trademarks and service marks. Thomas also stated that ". . . Ramada would be in a position to consider a new Application from you at the point of time in the future when you have accomplished the upgrading and refurbishing matters which you indicate are contemplated. Based upon Mr. Demarest's review of your facility, you are aware of the areas of concern by our people with the physical facility and the areas of improvement needed to meet our minimum quality standards". In a letter and telephone conversation in late December, 1977, Reading Overstreet encouraged the defendants to contact Ramada if they were still interested in pursuing the Ramada franchise "after improvements are made" and to continue their plans for upgrading and improvement in the belief that once those improvements were made a formal franchise agreement would be forthcoming. These were the last contacts that the plaintiff had with the defendants until this suit was served on November 14, 1978.

(12) As the consumable goods purchased by the defendants bearing the Ramada logo were consumed, the defendants did not replace them, with the exception of one occasion on which the defendants borrowed some Ramada Inn matches from a competing franchisee twenty two miles south along the interstate. The defendants did keep in good repair, however, the Ramada Inn billboards and the two signs on their property. The plaintiff's licensee, Heath and Company, continued to charge the defendants rent on the sign owned by it and did represent to the defendants that it could not take the sign down. Following the service of this law suit, and preceding

the hearing before United States District Judge Sol Blatt, the defendants began taking steps to discontinue its use of the Ramada Inn name and logo. The defendants then consented to the imposition of a preliminary injunction by Judge Blatt and had fully and completely complied with the commands of such injunction by the end of February, 1979.

(13) The decision of the defendants to purchase. the motel property was based, in part, upon its identification as a Ramada Inn and the contacts with the plaintiff in the spring of 1977. At the time that the defendants took possession of the property, it was obvious to them that a substantial amount of repairs and upgrading was necessary if it was to remain a member in good standing of the Ramada Inn hotel group. At that time, however, the defendants did have the options of converting to a "budget operation" unaffiliated with any chain, seeking affiliation with some other chain, or attempting to resell the property to other investors for a quick profit. Based in part upon the amicable and encouraging relations with Reading Overstreet, the plaintiff's representative, the defendants elected to continue to pursue the Ramada possibilities, invested a substantial amount of money in repairs and upgrading, and spent in excess of One Hundred and Ten Thousand and 00/100 ($110,000.00) Dollars for such purpose. However, the expenditure of those sums has benefited the defendants to some extent and will continue to do so in the future.

(14) From the time that the defendants first began operating the instant motel property, through the end of February 1979, by which time it had been completely converted to become known as "The Thunderbird Inn of Manning," the defendants realized room rental revenue on a monthly average of Seventeen Thousand Five Hundred and Five and 00/100 ($17,505.00) Dollars. The Thunderbird Inn of Manning, since March 1, 1979, has realized an average monthly room rental revenue of Twenty One Thousand Six Hundred and Twenty Four and 00/100 ($21,624.00) Dollars. Through the end of calendar year 1978, the defendants lost almost One Hundred Sixty Three Thousand and 00/100 ($163,000.00) Dollars in the operation of their motel (their cash flow loss, excluding depreciation, was approximately One Hundred and Ten Thousand and 00/100 ($110,000.00) Dollars). For calendar year 1979 the defendants have suffered a loss of Ninety Nine Thousand Five Hundred and Sixty Two and 00/100 ($99,562.00) Dollars (the cash flow loss, excluding depreciation, was approximately Sixty Nine Thousand and 00/100 ($69,000.00) Dollars). Two competing Ramada Inn franchise operations within seventy five miles of the defendants' motel along Interstate Highway 95 experienced the best years they have ever had in 1977 and 1978.

(15) The defendants, during the period prior to January 1, 1979, did use a number of consumable items bearing the name and marks of the plaintiff. The defendants did not, however, counterfeit, copy, or reproduce any such items. The defendants, during the period of time prior to the end of February 1979 used five billboards and two other signs bearing the name and marks of the plaintiff and did make certain repairs to those signs. The defendants have no current right to use the name, the logo, or any other marks or identifying characteristics of the plaintiff. The defendants have, however, suffered no gain as a result of such use in the past and the plaintiff has suffered no loss as a result of such use in the past.

## CONCLUSIONS OF LAW

(1) This court has jurisdiction of the parties and the subject matter. 28 U.S.C. § 1338.

(2) The defendants possess no right to use any of the plaintiff's service marks, trademarks, or name and the plaintiff is entitled to a permanent injunction forbidding such use. 15 U.S.C. § 1116.

(3) A successful plaintiff in a trademark infringement case is not always entitled to a monetary award in addition to injunctive relief, since any award for dam-

ages is subject to the principles of equity which give the court discretion based upon a wide range of considerations. 15 U.S.C. § 1117. *See also, Carl Zeiss Stiftung v. Veb Carl Zeiss Gena*, 433 F.2d 686 (2nd Cir. 1970) *cert. denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971); *Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 192 U.S. P.Q. 289 (2nd Cir. 1976).

■ (4) There has been no showing that the defendants profited from their infringement. Therefore, there is no reason to grant relief other than that given by an injunction. *Chester H. Roth, Inc. v. Esquire, Inc.*, 186 F.2d 11 (2nd Cir. 1951); *Caesar's World, Inc. v. Venus Lounge, Inc.*, 186 U.S.P.Q. 497 (3rd Cir. 1975).

(5) An injunction will satisfy the equities of the present case, particularly since there has been no showing of fraud or palming off. The defendants made immediate contact with the plaintiff when they first began thinking of their motel venture. They tendered to the plaintiff royalty fees which the prior owner had not paid for four years. They paid to the plaintiff a franchise application fee and negotiated with the plaintiff in good faith in an attempt to satisfy all of the plaintiff's known requirements. The defendants held the good faith belief that their use of the plaintiff's marks, under the circumstances, was condoned by the plaintiff. An award of damages is not necessary to deter these defendants from infringing the plaintiff's marks in the future, and the defendants' conduct in the past has not denoted a bad-faith intent to infringe or reap the harvest of the plaintiff's trademarks and advertising. *See, Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947); *Carl Zeiss Stiftung v. Veb Carl Zeiss Gena, supra; Golden Door, Inc. v. Odisho*, 437 F.Supp. 956 (N.D.Cal.1977); *Electronics Corporation of America v. Honeywell, Inc.*, 358 F.Supp. 1230 (D.Mass.1973) *aff'd*, 487 F.2d 513, *cert. denied*, 415 U.S. 960, 94 S.Ct. 1491, 39 L.Ed.2d 575 (1974).

(6) Beginning in September of 1973, when royalty and other payments ceased from Mid-South Motels, Inc., this plaintiff had reason to know that a problem existed with the then duly franchised Ramada Inn of Manning. As early as February 1975 the plaintiff knew that foreclosure proceedings were under way and revoked the franchise of Mid-South Motels, Inc. However, the plaintiff did not attempt to enforce its remedies or to seek the voluntary cooperation of the Receiver, but rather it continued to acquiesce in the use of its name, logo, and marks. Beginning in June 1977, the plaintiff began a series of steps that its own Franchise Division Chief described as "contradictory" when, during the same period of time, some of the plaintiff's agents were telling these defendants to discontinue using the marks of the plaintiff and another agent of the plaintiff was soliciting the defendants' business and telling the defendants not to worry about their continued use of those marks. The fact that the head of the franchise division was "shocked" by the contradictory conduct of the plaintiff supports the defendants' contention of their confusion concerning the situation. The defendants were being led to believe that the plaintiff would continue to acquiesce in their use of its marks and that there was a real and distinct possibility that the defendants would become a formal franchised operation as soon as the needed repairs and improvements were completed. I find that the plaintiff delayed unreasonably in enforcing its remedies and that the defendants were prejudiced thereby. Such delay will not bar the issuance of injunctive relief; however, the circumstances of this particular case are such that, upon balancing the interests and equities arising therefrom, I am compelled to deny any award for damages. *See, James Burrough Ltd. v. Sign of Beefeater, Inc.*, 572 F.2d 574 (7th Cir. 1978); *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866 (E.D.N.Y.1978); *Anvil Brand, Inc. v. Consolidated Foods Corp.*, 464 F.Supp. 474 (S.D.N.Y.1978); *J. C. Penney Co., Inc. v. Security Tire & Rubber Co., Inc.*, 382 F.Supp. 1342 (E.D.Va.1974).

(7) Although the defendants did expend a considerable amount of money making repairs and improvements to their property,

undoubtedly some of which would not have been undertaken at that time but for the plaintiff's flirtation, it is evident that the repairs and improvements are of benefit to the defendants and will accrue to their benefit in the future. The plaintiff did breach its agreement with the defendants, the nature of that agreement having been to give serious consideration to the defendants' franchise application. Moreover, the defendants did rely on the plaintiff's representations to their detriment, with regard to the timing of the repairs which they made. The defendants, however, suffered no damages as a result of the plaintiff's breach.

It is, therefore,

ORDERED, ADJUDGED AND DE-CREED, that the defendants and all of their employees, agents, officers and directors, and all persons acting in active concert or participation with all or any of them, be, and hereby are, permanently enjoined from rendering hotel inn and restaurant services or advertising or selling any goods or services identified by all or any of the marks of the plaintiff or any term or terms confusingly similar thereto and from unfairly competing with the plaintiff by using any name, mark, or indicia of origin of the plaintiff or one which is confusingly similar thereto; and,

IT IS FURTHER ORDERED, AD-JUDGED AND DECREED, that as to the first and second cause of action, the plaintiff shall take nothing by way of damages, costs, or attorney's fees; and,

IT IS FURTHER ORDERED, AD-JUDGED AND DECREED, that as to the counterclaim, the defendants shall take nothing by way of damages, costs, or attorney's fees.

The Clerk is directed to enter on the rolls of this court a judgment in accordance with the terms of this order.

AND IT IS SO ORDERED.