**GENERAL ELECTRIC COMPANY and Carboloy, Inc., Plaintiffs,**

v.

**Robert SPEICHER; and Speicher, Inc., Defendants.**

**Civ. No. F 87–98.**

United States District Court, N.D. Indiana, Fort Wayne Division.

Jan. 21, 1988.

Reed Silliman, Baker, Daniels & Shoaff, Fort Wayne, Ind., Donald L. Welsh, A. Sidney Katz, Eric C. Cohen, Robert B. Bleisblatt, Welsh & Katz, Ltd., Chicago, Ill., Arthur E. Bahr, General Elec. Co., Hudson Falls, N.Y., for plaintiffs.

Albert L. Jeffers, Jeffers, Hoffman & Niewyk, Fort Wayne, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

The plaintiffs' complaint in this matter charges the defendants with trademark infringement and counterfeiting under 15 U.S.C. § 1114 and § 1116(d), violation of the Lanham Act, and unfair competition. Defendants have counterclaimed for damages sustained in plaintiffs' seeking, obtaining, and conducting an alleged wrongful *ex parte* search and seizure.

This court's subject matter jurisdiction is based on 28 U.S.C. § 1332 which gives federal district courts jurisdiction over cases where there is complete diversity of citizenship and when the amount in controversy exceeds $10,000. Plaintiff General Electric is a citizen of New York. Plaintiff Carboloy, Inc. is a citizen of Michigan. Defendants are citizens of Indiana. Even without diversity, this action could be brought into federal court under 28 U.S.C. § 1331, the "federal question" statute because this case involves questions of federal law under Title 15 of the United States Code.

A trial without a jury was held on October 14 and 19, 1987 in Fort Wayne, Indiana.

In addition, both parties have filed post-trial briefs. This memorandum and order constitutes the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

### II.

The defendant, Robert E. Speicher is president of Speicher, Inc., a small, family-owned fabricating business his father started some 35 years ago. Speicher has worked there since he was thirteen. He started as an errand boy and has worked in every conceivable position of that business over the past 25 years. Fourteen years ago he assumed the position of president of the company, a position he still holds.

Speicher, Inc. is a fabricator of cutting inserts. Cutting tools are typically made up of a tool holder and a cutting insert. Cutting inserts are made from pre-formed pieces called "substrates". Speicher, Inc. grinds these carbide substrates to its customers' specifications and then sends them elsewhere to be "coated". Much of their work involves grinding "specials" which are inserts that must be ground specially, as opposed to standard inserts which are generally mass-produced by larger operations. If a carbide company receives a "special" order, it often will pay a fabricating company like Speicher, Inc. to grind the specials. This procedure is generally cheaper and much faster than having to specially tool in order to produce non-standard inserts.

Sometimes Speicher, Inc. acts merely as a middle-man. That is, it orders inserts already ground and coated which its customer wishes to purchase. Speicher, Inc. then does nothing to the insert, but merely resells to its customer. Speicher, Inc. also buys substrates which it grinds for its own customers. In other words, Speicher, Inc., in addition to grinding specials for carbide companies, has its own customers who order inserts directly from Speicher, Inc.

Speicher, Inc. does not retain a sales force. Its orders are obtained through word-of-mouth and years of established business relationships. It does not solicit its orders. Still, it receives plenty of busi-

ness. In recent years, gross sales have well exceeded one million dollars per year. Both defendants Speicher and Speicher, Inc. will hereinafter be referred to as "Speicher".

General Electric Company has for many years owned and operated a carbide plant which manufactures cemented carbide products which it then sells to fabricators or large customers that purchase standard inserts. Apparently, this operation was sold on September 25, 1987, five months after the lawsuit was commenced, to a gentleman named Sandvick. It is now called Carboloy, Inc. For simplicity's sake, all plaintiffs will hereinafter be referred to as "G.E." G.E. has used Speicher's fabricating services for some 25 years. At one time, Speicher did work exclusively for G.E. Until this lawsuit was filed, G.E. had had no known problems or complaints with regard to Speicher's work. In fact, the G.E.–Speicher, Inc. business relationship has continued since the filing of the lawsuit. Since May of 1987, Speicher has purchased approximately $45,000 worth of products from G.E.

Tools and Abrasives, Inc. (T & A) is not a party to this lawsuit but has played an important role throughout. T & A is an industrial distributor, specializing in the distribution of cutting tools, hand soap, cleaners, a coolant, and some kinds of brushes. One of the companies it represents is G.E. T & A has worked successfully with Speicher for years. T & A's former purchasing agent testified that, at least until the incident in question, she had always felt that Mr. Speicher had an excellent reputation and was an honest, reliable businessman.

This lawsuit resulted from a chain of events that began in 1984 when Chrysler Transmission of Kokomo, Indiana ("Chrysler") requested a price quotation from T & A for a grade 570 carbide insert.[1] T & A obtained a quotation from G.E. which

Chrysler rejected. In 1985, Chrysler again requested a price quotation on the same insert. At that time, T & A's purchasing agent, Carol Betz, knowing the G.E. quote would probably again be rejected, recommended to Ned Ellis, the general manager of T & A, that a quote be obtained from Speicher. Speicher's quote was radically lower than G.E.'s.

There is conflicting testimony as to whether Speicher informed T & A that he was providing an equivalent to 570 as opposed to genuine Carboloy 570. T & A claims that Speicher told them he was providing 570. Speicher claims he told T & A he was providing a substitute. This court finds that the evidence clearly indicates that Speicher, who was a very credible witness, had no intent to deceive his customer, T & A. Speicher either made it clear to T & A that he was providing a substitute or he *thought* he had made it clear. In light of all the evidence, this is the only conclusion that makes sense. Speicher has a flawless business record. In addition to his reputation, the circumstances of this series of incidents would certainly lead to the same conclusion. First of all, he made only a small profit ($1,500) on this particular job. He had little to gain in deceiving T & A. Also, the activity which led to this lawsuit (shipping substrate 570 in G.E. boxes) was confined to this job. Indeed, Speicher sent the first shipments which are the subject of this lawsuit in white generic boxes. He only switched to G.E. boxes after he received instructions to do so from T & A. Finally, the price differential between Speicher's quote and G.E.'s quote was so great that the fact that the insert was a 570 equivalent rather than the genuine article seems evident.

Speicher did later receive Chrysler's blueprint which specified 570 and "no substitutes." He ignored those words because he felt that the substitution had already

---

1. The number "570" in the cutting tool business is apparently associated with G.E.'s Carboloy operations which manufacture an insert made of a particular carbide substrate coated with a special coating, the make-up of which is known only to G.E. The finished coated insert is known in the trade as the "Carboloy 570" insert or just "570". Although "570" is an unregistered trademark, it is associated with G.E.'s Carboloy operations. The number is an arbitrary term as applied to carbide substrates.

been accepted. This belief makes sense when one considers the way Speicher does business. The "gentleman's agreement" method has always worked in the past for Robert Speicher. He usually takes orders over the phone which are often completed before any formal paperwork comes through. For example, Speicher testified that just recently, in February of 1987, he did a job for G.E. for which he received the formal purchase order *three weeks after* the job was completed and shipped to the customer. It is not surprising that he put more faith in his personal dealings with T & A than he did in a formalistic blueprint from Chrysler, who was T & A's customer, not his.

Speicher proceeded to fabricate the special inserts using a substrate he felt was equivalent to the 886 substrate, which is normally used to produce a 570. Speicher, Inc. then sent the ground substrates to a coating company. After the substrates were coated, they were shipped back to Speicher, Inc. which then shipped them to T & A. T & A, in turn, shipped them to Chrysler. As noted previously, the first few shipments from Speicher, Inc. to T & A were sent in plain white boxes. T & A then sent Speicher, Inc. empty G.E. boxes. This apparently was not unusual. Speicher, Inc. had received literally thousands of empty G.E. insert boxes over the years in which it would pack its G.E. orders. Robert Speicher saw nothing unusual in T & A's shipment of G.E.'s boxes as he knew T & A was a G.E. distributor. T & A had also sent G.E. boxes to Speicher, Inc. before. Occasionally when time was of the essence, Speicher was instructed to "drop ship" orders directly to G.E.'s or T & A's customer. On those occasions, G.E. would even provide their packing slips which Speicher put inside the boxes. He would also put G.E. return address labels on the boxes so they appeared to have been shipped directly from G.E. It is easy to see why Robert Speicher did not question the use of the G.E. boxes. It should also be noted that, in all the years G.E. provided its boxes to Speicher, Inc., it never gave any instructions or rules as to their use.

On later shipments, T & A asked Speicher, Inc. to begin etching "570" on the inserts. Because G.E. has Speicher, Inc. etch G.E.'s grades on inserts all the time, this seemed like a reasonable request and Speicher began the etching. At all times, Robert Speicher assumed that T & A, as G.E.'s distributor, had the authority to request the etching and the use of the boxes, especially when it was T & A itself that sent Speicher, Inc. the G.E. boxes. It is obvious from Robert Speicher's testimony that he sincerely believed that orders from T & A were authorized orders from G.E. Throughout his testimony he referred to his dealings with T & A as dealings with "G.E." Moreover, his belief that G.E. was ultimately responsible for this order has some reasonable basis considering past behavior by G.E. Speicher testified that, several times in the past, he shipped non-genuine G.E. carbide in G.E. boxes per G.E.'s instruction. TR 358.

Late in 1986, after Speicher, Inc. had been supplying 570 substitute inserts for many months, Richard Graham, Chrysler's tool technologist was informed that there were problems with the 570 inserts which were not yielding the expected number of pieces per cutting edge. More than 60 cuts were expected, but only between 15 and 30 were being realized. Graham showed an insert to Mike Novak, a sales representative for G.E. Novak later informed Graham that the insert was not a genuine Carboloy 570. Graham then sent an insert to Chrysler's metallurgical lab and contacted Ned Ellis, general manager of T & A, who told Graham that Speicher, Inc. had been supplying the inserts, not G.E. Even after discovering that the substrates were not 570, Chrysler still agreed to continue to receive the Speicher, Inc. inserts because without inserts the Chrysler plant would have had major production problems. An order for genuine 570 inserts was placed with G.E. but it was about eight months before G.E. could provide them.

This suit was filed on April 21, 1987. At that time plaintiff also motioned, *ex parte,* for an order directing a seizure of the alleged infringing goods under 15 U.S.C. § 1116(d). That motion was reluctantly

granted by this court. The *ex parte* seizure took place on May 1, 1987. At least one federal marshal, several plaintiffs' attorneys and an investigator sent by G.E. spent six (6) hours searching Speicher's business premises. They also took photographs. Apparently the search was thorough, perhaps overly so, as it included Speicher's desk drawers, his files, vault and his briefcase.

This case was tried on the merits on October 14 and 19, 1987, without a jury. At that time, this court requested that each party submit post trial briefs by November 30, 1987. Both sides have since filed their briefs.

Having heard the evidence in open court and having scrutinized the parties' briefs, this court is now prepared to rule on the merits.

## III.

The federal law of trademarks, 15 U.S.C. §§ 1051–1127 (1982 & Supp. II 1984) (the "Lanham Act") defines a trademark as

any word, name symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify and distinguish his goods ... from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

The common law also uses this basic definition of trademark. McCarthy, *Trademarks and Unfair Competition*, § 3.1 (2d ed. 1984).

This case revolves around defendant's alleged infringement of the federally registered General Electric monogram and signature trademarks, the federally registered Carboloy trademark and the common law "570" trademark. Before discussing the possible infringement of these marks, it is first necessary to decide the threshold issue of whether the marks are entitled to the protection of the law. *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1014 (9th Cir.1985). Federally registered trademarks like General Electric and Carboloy are presumed to be distinctive and are afforded the utmost protection. *Lois Sportswear, U.S.A., Inc.*

*v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2nd Cir.1986). The "570" mark requires special analysis, however, due to the fact that it is: (1) unregistered and (2) is a mere number. A mark needn't be registered to be a valid, protected trademark. *See, e.g., Holiday Inn v. Holiday Inns, Inc.*, 534 F.2d 312, 319 (C.C.P.A.1976); *Silverman v. CBS Inc.*, 632 F.Supp. 1344, 1356 (S.D.N.Y. 1986); *WGBH Educational Foundation, Inc. v. Penthouse International Ltd.*, 453 F.Supp. 1347, 1350 (S.D.N.Y.1978) (usage, not registration, confers the right to a trademark). If the mark is used by a manufacturer to identify his goods, it is a trademark. The amount of protection to which it is entitled depends on various factors such as its marketplace recognition, its uniqueness, and whether it is generic, descriptive or suggestive. For example, a unique, highly recognizable mark like "Exxon" enjoys great protection while a generic mark like "aspirin" cannot be a trademark at all. *See, e.g., Exxon Corp. v. Xoil Energy Resources, Inc.*, 552 F.Supp. 1008 (S.D.N.Y.1981) (Exxon is an arbitrary mark entitled to the widest protection possible); *Bayer Co. v. United Drug Co.*, 272 F. 505 (D.C.N.Y.1921). Numerals can be valid trademarks if they are entirely arbitrary and have no connection with the article or any of its features. *Nature's Bounty, Inc. v. Basic Organics*, 432 F.Supp. 546, 551 (E.D.N.Y.1977). A numeral mark is not valid if it describes or refers to the article or its characteristics. *Id.*

G.E. identifies a particular insert as a "570." This number is not descriptive of the product in any way and is, in fact, totally arbitrary. However, it is understood in the cutting tool industry to be the representative mark of a particular insert made by General Electric Carboloy. In light of these factors, this court now finds that "570" is a valid trademark which is entitled to protection from infringement. As noted above, the General Electric monogram and signature trademarks and the Carboloy trademark are obviously also entitled to such protection.

Having found the marks in question to be valid trademarks, this court must now

address the issue of the alleged infringement of those marks by Speicher.

■ G.E. first contends that Speicher violated G.E.'s rights under 15 U.S.C. § 1114(1)(a) which says:

(1) Any person who shall, without the consent of the registrant—

(a) *use in commerce any reproduction, counterfeit, copy, or colorable imitation* of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use *is likely to cause* confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.... (emphasis added)

The use of the "570" mark is not at issue under this section as it is not a registered mark. This court also fails to see how this section can apply to Speicher's use of the G.E. boxes. It clearly refers to "any reproduction, counterfeit, copy, or colorable imitation" of a registered mark. Speicher did not copy the G.E. or Carboloy marks. Speicher used *actual* G.E. boxes which carried the authentic G.E. trademarks. G.E. cites no authority, nor is this court aware of any authority, which would put a defendant's use of a *genuine* mark within the ambit of this particular statute.

■ G.E. next argues that its trademarks were infringed by Speicher under 15 U.S.C. § 1125(a) which says:

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

■ Under this section, a mark need not be registered to be protected. *Miller Brewing Co. v. Falstaff Brewing Corp.*, 503 F.Supp. 896, 902 (D.R.I.1980). Section 1125(a) is broader in scope than § 1114. *Id.* Its purpose is to prevent unfair competition by enabling producers to differentiate their products from those of others and to protect consumers against deceptive designations of origins of goods. *Lacoste Alligator, S.A. v. Bluestein's Men's Wear, Inc.*, 569 F.Supp. 491, 498 (D.C.S.C.1983). It covers a wide variety of misrepresentations of products, implicating a broad spectrum of marks, symbols, design elements and characters. *20th Century Wear, Inc. v. Sanmark–Stardust, Inc.*, 747 F.2d 81, 91, (2d Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (2d Cir.1984). Speicher's use of the G.E. boxes and the "570" markings on the non-genuine 570 inserts was prohibited by this section. The marks on the containers, although genuine, misrepresented the contents of those boxes, as did the 570 marks which Speicher applied to many of those inserts. The misrepresentations led to the actual confusion of the ultimate consumer, Chrysler. Whether Speicher intended to confuse anyone is irrelevant to the technical finding of infringement under § 1125(a). Good faith is not a defense to trademark infringement. *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596, *reh. den. en banc*, 761 F.2d 695 (5th Cir.1985); *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir.1984); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 158 (9th Cir.1963), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963). No intent to deceive need be demonstrated under § 1125(a) to make out a claim for false designation of origin. *G's Bottoms Up Social Club v. F.P.M. Industries, Inc.*, 574 F.Supp. 1490, 1495 (D.C.N. Y.1983). The test is "likelihood of confu-

sion" and whether there is such likelihood is always the central issue in any suit for trademark infringement. *Fuji Photo Film, supra,* 754 F.2d at 594. Obviously, a showing of actual confusion normally satisfies plaintiff's burden of proving a likelihood of confusion as long as the actual confusion is justified. *Exxon Corp. v. Texas Motor Exchange, Inc.,* 628 F.2d 500, 506 (5th Cir.1980) ("The best evidence of likelihood of confusion is provided by evidence of actual confusion."); *Union Carbide Corp. v. Ever–Ready, Inc.,* 531 F.2d 366, 383 (7th Cir.1976), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). *See also* McCarthy, *Trademarks and Unfair Competition* § 23:2 (2d ed. 1984). There is no question that Chrysler believed it was getting genuine G.E. 570 inserts. There is also clearly no question that the "in commerce" requirement of § 1125(a) is satisfied. It is well-settled that, even if the transaction which is the subject of the court action is strictly an intrastate act of infringement (the transactions in question all took place within the state of Indiana), a "substantial effect" on interstate commerce is found merely by the adverse effect which local infringements have upon the plaintiff's federally registered mark which is used in interstate commerce. McCarthy, *Trademarks & Unfair Competition,* § 25:15 (2d ed. 1984); *Maier Brewing Co. v. Fleischmann Distilling Corp.,* 390 F.2d 117 (9th Cir.1968), *cert. denied* 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968). In other words, it is enough that plaintiff's reputation and good will, built up by use in interstate commerce, are adversely affected by an intrastate infringement. *Franchised Stores of New York, Inc. v. Winter,* 394 F.2d 664 (2nd Cir.1968). This court finds that defendant Speicher technically violated 15 U.S.C. § 1125(a) by use of the G.E. mark which deceived a purchaser concerning the source of the goods. *See Mortellito v. Nina of California, Inc.,* 335 F.Supp. 1288, 1294 (S.D.N.Y.1972).

■ G.E. also contends that Speicher has committed the common law tort of unfair competition. A plaintiff complaining of trademark infringement in federal court may invoke federal protections (here,

plaintiff chose to bring action under 15 U.S.C. § 1114 and § 1125) or state protections (here, the Indiana common law tort of unfair competition) *or both* (as plaintiff did). *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 916 (9th Cir.1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981). In analyzing plaintiff's state law claim of unfair competition, this court must look to Indiana law because this cause of action arose in Indiana. *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Generally speaking, under Indiana law, the same set of facts which support a trademark infringement action are applicable to a claim for unfair competition. *Terry v. International Dairy Queen,* 554 F.Supp. 1088, 1098 (N.D.Ind.1983). In Indiana, *any conduct* which has the natural and probable tendency to deceive so as to pass off the goods or business of one person as and for that of another, creates a cause of action for unfair competition. *Hammons Mobile Homes, Inc. v. Laser Mobile Home Transport,* 501 N.E.2d 458, 461 (Ind.App. 1986). The conduct needn't be intentional; it is only necessary that plaintiff show that deception is the natural and probable consequence of the tortfeasor's actions. *Id.* Actual examples of deception will afford strong proof of the deceptive tendency of defendant's acts. *Id. See also Hartzler v. Goshen Churn and Ladder Co.,* 55 Ind. App. 455, 104 N.E. 34 (1914). As Chrysler was actually deceived, this court must find that defendant committed the Indiana common law tort of unfair competition.

■ Defendant claims, however, that G.E. is estopped from bringing its cause of action at all because of G.E.'s own past actions. The estoppel defense has been treated differently by different courts in trademark infringement cases. J. Thomas McCarthy, has made the following observation concerning estoppel in such cases:

There is much semantic confusion in the case opinions over the distinction, if any, between "laches", "estoppel by laches" and "acquiescence". The Supreme Court precedent discussed above, often uses "acquiescence" as an apparent syn-

onym for delay coupled with such prejudice that an implied consent can be inferred. Other cases reserve use of the word "acquiescence" only for factual situations where the trademark owner has by affirmative word or action conveyed to the infringer the message that its acts are not objectionable. In reading the cases, it is often impossible to tell exactly how the word "acquiescence" is being used and what it signifies. If "acquiescence" only means that kind of failure to sue which, coupled with other facts will bar monetary or injunctive remedies, then the term would have no independent significance. It would then only be rhetorical hyperbole for laches or estoppel by laches.

To preserve some semantic sanity in the law, it would seem appropriate to reserve the word "acquiescence" for use only in those cases where the *trademark owner, by affirmative word or deed, conveys its implied consent to another. That is, laches denotes a merely passive consent, while acquiescence implies active consent. In this set of definitions, we would have "estoppel by laches" as distinct from "estoppel by acquiescence".* Use of the word "acquiescence" to denote implied consent from affirmative conduct seems appropriate in those cases where the litigants had been engaged in continuous business dealings and the *trademark owner impliedly encouraged its business partner's use of the mark over a long period of time....* *A plaintiff cannot indicate at one time to defendant that defendant's acts are acceptable and then later sue defendant after it has acted in reliance on plaintiff's implied assurances.*

(emphasis added) (footnotes omitted).

J.T. McCarthy, *Trademarks and Unfair Competition* § 31:14 (1984). Speicher apparently is claiming that G.E. is estopped from bringing suit under a theory similar to McCarthy's "estoppel by acquiescence" as described above. Speicher would have a good argument under that theory except that, in this particular case, it was not G.E. who sent Speicher, Inc. the boxes, but T & A. If G.E. had sent the boxes directly to

Speicher, it would obviously have been estopped from claiming that Speicher could not use those boxes, at least without providing specific direction as to their use.

But Speicher claims that T & A *is* G.E., therefore it was G.E.'s conduct upon which Speicher relied. There is no question that T & A is a totally separate entity which is not a part of G.E. Nor does T & A have actual authority to act as agent for G.E. This is clearly set forth on the "Distributor Agreement" between G.E. and T & A. Plaintiff's Exhibit 6. The relationship between G.E. and T & A is described as that of vendor and vendee. The contract specifically states that "under no circumstances" shall the distributor (T & A) be "deemed agents or representatives of the manufacturer (G.E.)...."

Speicher, however, argues that T & A had "apparent authority" which binds G.E. Apparent authority exists when some manifestation by the principal causes a third person to reasonably believe an agent possesses authority to act as he does. *Herald Telephone v. Fatouros,* 431 N.E.2d 171, 175 (Ind.App.1982). Apparent authority can be created even in the absence of any actual authority.

Apparent authority arises when the principal, either intentionally or by lack of ordinary care, induces third persons to believe an individual is his agent *even though no actual authority,* express or implied, *has been granted to such individual.* (emphasis added)

*Wells Fargo Business Credit v. Ben Kozloff, Inc.,* 695 F.2d 940 (5th Cir.1983), rehearing denied, 699 F.2d 1163, cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *Canyon State Canners, Inc. v. Hooks,* 74 Ariz. 70, 243 P.2d 1023 (1952). This court finds that no apparent authority was created. There was no actual agency and the existence of an ostensible agency has not been shown. Speicher was a reasonable businessman who knew or should have known the actual relationship that existed between G.E. and T & A. Although it is evident from his testimony that he believed that G.E. and T & A were one and the same business, Speicher has failed

to show that G.E.'s conduct was such that a reasonably prudent businessman would be led to believe an agency was created. Apparent authority is determined by acts and conduct of the alleged principal and not by acts of the alleged agent. *See, e.g., Wells Fargo Business Credit*, 695 F.2d at 946; *Williams v. Washington Metropolitan Area Transit Authority*, 721 F.2d 1412, 1417 (D.C.Cir.1983). Speicher based his assumption of authority on T & A's action (the alleged agent) *not* on G.E.'s actions. That is, when T & A sent him the G.E. boxes, Speicher assumed that G.E. had authorized their use. Speicher simply did not question the situation.

Speicher, however, argues that *past* behavior by G.E. created apparent authority. G.E. catalogs had T & A stickers attached to them. Also, G.E. had often sent G.E. boxes to Speicher to use with G.E. orders. This court is not convinced that G.E. manifested T & A's apparent authority. G.E.'s supplying boxes to Speicher hardly manifests any authority of T & A. T & A stickers on G.E. catalogs also can't be said to be manifestations by G.E. of T & A's authority. Speicher did not act in bad faith. However, he may have been negligent in failing to question the entire transaction. This court finds that no apparent authority was created and therefore, G.E. cannot be estopped under that theory.

### IV.

Having found that defendant Speicher violated 15 U.S.C. § 1125(a) and committed the common law tort of unfair competition, this court must now address the issue of damages. Plaintiff claims damages under 15 U.S.C. § 1117(a) and under Indiana common law remedies. Section 1117(a) is set forth below:

**(a) Profits; damages and costs; attorney fees**

When a *violation of any right of* the registrant of *a mark registered* in the Patent and Trademark Office *shall have been established in any civil action* arising under this chapter, the *plaintiff shall be entitled,* subject to the provisions of sections 1111 and 1114 of this title, and *subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.* The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court *in exceptional cases may award reasonable attorney fees* to the prevailing party.

**(b) Treble damages for use of counterfeit mark**

In assessing damages under subsection (a) of this section, the *court shall,* unless the court finds extenuating circumstances, *enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 1114(1)(A) of this title* or section 380 of Title 36 that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services. In such cases, the court may in its discretion award prejudgment interest on such amount at an annual interest rate established under section 6621 of Title 26, commencing on the date of the service of the claimant's pleadings setting forth the claim for such entry and ending on the date such entry is made, or for such

shorter time as the court deems appropriate. (emphasis added)

Although this section seemingly applies to only registered marks, at least two circuits have concluded that these remedies also apply to unregistered marks. *W.S.M., Inc. v. Wheeler Media Services, Inc.*, 810 F.2d 113, 116 (6th Cir.1987) ["all of the section 1117 remedies, including attorney's fees, apply to actions brought pursuant to 1125(a)"]; *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450, 453–458 (11th Cir.1984) [1117 remedies apply to 1125(a); to hold otherwise would undermine Congressional goals]. Therefore, Speicher's section 1125(a) violation is covered by this section.

Section 1117 provides for attorney's fees, compensatory damages (which include defendant's profits, actual damages sustained by the plaintiff and costs of the action), and punitive damages.

■■ Attorney's fees are not recoverable in this case under section 1117(a) because this is not an "exceptional case." An exceptional case has been described in this circuit as one in which infringement was malicious, fraudulent, willful or deliberate. *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738 (7th Cir.1985); *Bittner v. Sadoff & Rudoy Industries*, 728 F.2d 820, 828 (7th Cir.1984). Such is not the case here so no attorney's fees are recoverable.

■■ In fashioning a compensatory damages award under this section, this court has broad discretion in considering the equities of awarding such damages. *Otis Clapp & Son, Inc.*, 754 F.2d at 746 (any award for damages is subject to the principles of equity which give a court discretion based upon a wide range of considerations); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1495 (11th Cir.1983), *rehearing denied*, 718 F.2d 1115 (11th Cir.), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984) (section 1117(a) vests considerable discretion in district court which is guided by principles of equity). Factors other courts have considered in awarding damages for trademark infringement include whether defendant acted in bad faith, whether an injunction would sat-

isfy the equities of the case, the amount of profits defendant earned as a result of the infringement, and the amount of money lost by the plaintiff as a result of the infringement. *See, e.g., Nalpac, Ltd. v. Corning Glass Works*, 784 F.2d 752 (6th Cir.1986); *Ramada Inns v. Apple*, 482 F.Supp. 753 (D.S.C.1980); *Electronics Corp. of America v. Honeywell, Inc.*, 358 F.Supp. 1230 (D.C.Mass.1973), *affirmed*, 487 F.2d 513 (1st Cir.) *cert. denied*, 415 U.S. 960, 94 S.Ct. 1491, 39 L.Ed.2d 575 (1974).

■■ This court finds that the equities of this case preclude a monetary award. Speicher was an innocent infringer who acted in good faith. Speicher is a reputable businessman who has always enjoyed a spotless business record. The infringement was confined to one particular job. Speicher was and is quite willing to discontinue any further use of G.E. boxes or the 570 mark. Speicher's profit and G.E.'s alleged loss are relatively small. This court is convinced that an injunction is enough to satisfy the equities of this case based on the above factors.

Also not recoverable under this provision are treble damages which may be awarded under either 1117(b) for violation of 1114(1)(a) or under 1117(a) based on equitable considerations but not to penalize. As previously discussed, this court has found no violation of 1114(1)(a). Because it has also refused to award any monetary damages under 1117(a), there is no amount which can be tripled.

■■ Plaintiff also claims it is entitled to common law remedies due to defendant's tort of unfair competition. In particular, plaintiff asks for punitive damages of $50,000. Punitive damages are clearly inappropriate in this case. In Indiana, punitive damages may be awarded only upon a showing that the wrongful conduct was accompanied by certain aggravating circumstances. The purpose of punitive damages is not to compensate but to punish a defendant. *Carroll v. Statesman Insurance Co.*, 509 N.E.2d 825, 827 (Ind.1987). The issue is whether the conduct of the

defendant is so obdurate that it calls for an assessment of punitive damages. *Id.* [citing *Traveler's Indemnity Co. v. Armstrong,* 442 N.E.2d 349 (Ind.1982)]. Indiana appellate courts disagree on whether the conduct must be malicious or need only be willful and wanton. *See Miller Pipeline Corp. v. Broeker,* 464 N.E.2d 12 (Ind.App.1984) [declining to follow *Orkin Exterminating Co. v. Traina,* 461 N.E.2d 693 (Ind.App.1984)]. In any case, defendant's conduct was simply not egregious enough to warrant an award of punitive damages.

Compensatory damages are also inappropriate. In an unfair competition action, "damages are appropriate only when the defendant's conduct was deliberate and willful." *Hammons Mobile Homes, Inc. v. Laser Mobile Home Transport,* 501 N.E.2d 458, 462 (Ind.App.1987). This court has found that defendant's conduct was not deliberate and willful but at most, negligent.

In conclusion, the only remedy to which plaintiff is entitled under both legal and equitable theories, is injunctive relief. No monetary damages shall be awarded.

### V.

Finally, this court must address defendant's counterclaim for wrongful seizure. This counterclaim was brought under 15 U.S.C. § 1116(d)(11) which reads as follows:

A person who suffers damage by reason of a wrongful seizure under this subsection has a cause of action against the applicant for the order under which such seizure was made, and shall be entitled to recover such relief as may be appropriate, including damages for lost profits, cost of materials, loss of good will, and punitive damages in instances where the seizure was sought in bad faith, and, unless the court finds extenuating circumstances, to recover a reasonable attorney's fee. The court in its discretion may award prejudgment interest on relief recovered under this paragraph, at an annual interest rate established under section 6621 of Title 26, commencing on the date of service of the claim-

ant's pleading setting forth the claim under this paragraph and ending on the date such recovery is granted, or for such shorter time as the court deems appropriate.

■ This court finds that this is a permissive counterclaim which could have been brought as a separate action. Federal Rules of Civil Procedure, Rule 13(b); *See also* Wright & Miller, *Federal Practice and Procedure* § 1420 (1971) *and* H.R. Rep. No. 997, 98th Cong., 2nd Sess. 593 (1984). ("The result of the wrongful seizure action is, of course, independent of the result of the plaintiff's civil suit against the defendant.") Permissive counterclaims must be supported by independent grounds of federal jurisdiction. *By–Product Corp. v. Armen–Berry Co.,* 668 F.2d 956 (7th Cir.1982). Here, the jurisdictional basis is 28 U.S.C. § 1331, federal question jurisdiction.

Defendant claims that it is entitled to damages under this section because the seizure, which was ordered by this court on April 27, 1987, and carried out on May 1, 1987, was wrongful, both at its inception and because it was carried out improperly. Defendant does not claim that this court acted improperly in granting the seizure order but does claim plaintiff acted improperly and in bad faith in its pursuit of the order and its actual performance of the seizure. This court will first address plaintiff's original motion for seizure to determine if plaintiff acted improperly and in bad faith.

Section 15 U.S.C. § 1116(d)(4) sets forth the requirements which must be met before a seizure order can be granted:

The court shall not grant an application unless—

(A) the person obtaining an order under this subsection provides the security determined adequate by the court for the payment of such damages as any person may be entitled to recover as a result of a wrongful seizure or wrongful attempted seizure under this subsection; and

(B) the court finds that it clearly appears from specific facts that—

(i) an order other than an *ex parte* seizure order is not adequate to achieve the purposes of section 1114 of this title;

(ii) the applicant has not publicized the requested seizure;

(iii) the applicant is likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services;

(iv) an immediate and irreparable injury will occur if such seizure is not ordered;

(v) the matter to be seized will be located at the place identified in the application;

(vi) the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application; and

(vii) the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person.

■ Plaintiff submitted a memorandum of law with its motion which carefully considered each of the above subparts to § 1116(d)(4). Although plaintiff may have been a bit overzealous in its arguments, this court cannot find that it acted in bad faith. Plaintiff also submitted affidavits of three men who had personal knowledge of events surrounding the cause of action. Plaintiff also submitted copies of orders of other courts which had found *ex parte* seizures necessary. In retrospect, now that all the evidence has been presented and a trial conducted in open court, this court could easily second-guess its original granting of the *ex parte* motion. However, this court's decision was necessarily based on the evidence available at the time the motion was made. This court cannot say that plaintiff acted improperly or in bad faith in its application for the order. On the contrary, it was quite thorough in its support for said motion.

■ Defendant's next argument in support of its counterclaim revolves around plaintiff's actual performance of the seizure. Defendant claims that plaintiff greatly exceeded the scope of the order. The items plaintiff seized were not, in fact, counterfeit. Plaintiff also took many photographs. The seizure order makes no mention of photographs. This court agrees that plaintiff exceeded the scope of the order and conducted a wrongful search under § 1116(d)(11). The seizure order set specific limits:

... and IT IS FURTHER ORDERED, that the United States Marshal for the Northern District of Indiana, or one or more of his deputies, or any law enforcement officer be, and they hereby are, directed to enter defendants' premises at 922 North Main St., Topeka, Indiana, and to seize and impound forthwith

(a) all cutting inserts marked with the number "570" and all labels, signs, prints, packages, wrappers, boxes, receptacles and advertisements in defendants' possession, custody or control bearing any simulation reproduction, counterfeit, copy or colorable imitation of any of General Electric's trademarks;

(b) all simulations, reproductions, counterfeits, copies or colorable imitations of General Electric's trademarks, including any and all cutting inserts bearing reproductions of any of General Electric's trademarks including the designation 570;

(c) all plates, molds, machines and other means of making said simulations, reproductions, counterfeits, copies or colorable imitations of any of General Electric's trademarks;

(d) all books, records or documents of any kind in defendants' possession, custody or control which relate to said simulations, reproductions, counterfeits, copies or colorable imitations of General Electric's trademarks or which relate to their sale, offering for sale, transfer, purchase, or manufacture, of any product bearing any General Elec-

tric trademark, or any customer and supplier lists....

Plaintiffs did not stay within the limits of this order on May 1, 1987. First, they took photographs, some of which were used as plaintiffs' exhibits. Nothing in the order permits the taking of photographs. Second, many of the items seized had no connection with G.E. trademarks. For example, substrates bearing numbers other than "570" were seized. Also, documents having nothing to do with G.E. trademarks were seized. Some of these documents contained confidential business information.

Perhaps worst of all, the items seized were not placed in this court's custody as required by section 1116(d)(7), but retained by plaintiff. This was and is totally unacceptable. The statute is very clear on this requirement: (7) "Any materials seized under this subsection shall be taken into the custody of the court."

Defendant also claims that none of the items seized was, in fact, counterfeit. All items which bore G.E. trademarks were genuine. The report from the House Committee on the Judiciary had this to say about such a situation:

The term "wrongful seizure" is deliberately not defined in the statute. The court must determine whether the circumstances of a particular case constitute a "wrongful seizure." The Committee intends, however, that the term encompass at least three situations....

Second, *a seizure must be considered wrongful when the matter seized is not counterfeit.* In such a case, *it does not matter that the plaintiff believed in good faith that the matter was counterfeit.* As between two relatively innocent parties, the defendant is the more innocent. *The plaintiff initiated the seizure action and must suffer the consequences.*

House Comm. on the Judiciary, H.R. No. 98–997, 98th Cong., 2d Session 25.

The Senate Judiciary Committee limited this somewhat:

... the mere fact that a few non-counterfeit items may have been seized does not make the seizure as a whole wrongful."

Senate Committee on the Judicary, S.Rep. No. 98–526, 98th Cong., 2d Sess. 16, *reprinted in* 1984 *U.S. Code Cong. & Admin. News* 3627, 3642. This court finds that most, if not all, of the items seized were not counterfeit. Therefore, plaintiff must "suffer the consequences". Parties take great risks when they request *ex parte* seizures.

Under section 1116(d)(11), this court may award appropriate relief for lost profits, cost of materials, loss of good will and attorney's fees in case of wrongful seizure. Punitive damages are recoverable only where plaintiff sought the seizure in bad faith, which, as has already been discussed, is not the case here.

Defendant asks for $5,300.00 in damages for lost profits and cost of materials. In addition, defendant claims it is entitled to additional damages for loss of good will but has not specified an amount. As to the good will claim, defendant has failed to show any real loss of good will as a result of the actual seizure. In fact, plaintiff itself still does business with defendant. This court will not pick a number out of thin air, without more, to satisfy an illusory loss of good will claim by defendant. As to defendant's claimed actual damages, the $5,300.00 breaks down as follows:

1. $350.00 profit loss the day of seizure due to defendant's inability to ship out normal amount of finished materials which resulted from the six-hour work interruption. (TR. 400.)

2. $750.00 profit lost due to defendant's inability to supply genuine 570 carbide which a customer requested that day but which defendant was unable to supply as a result of plaintiff's seizure. (TR. 400.)

3. $4,200.00 business lost from Chrysler New Castle as a direct result of the lawsuit. (TR. 402.)

The third amount claimed must be rejected because defendant has not shown that the alleged loss was a direct result of the seizure. The first two amounts appear to be valid, however. Therefore, this court

ORDERS that plaintiff G.E. reimburse defendant Speicher, Inc. for $1,100.00 lost profits resulting from the wrongful search.

As to defendant's entitlement to reasonable attorney's fees, this court finds that Speicher and Speicher, Inc. are so entitled. Attorney's fees under section 1116(d)(11) are to be awarded if a wrongful seizure is committed *unless* there are extenuating circumstances. This may be contrasted to section 1117 which awards attorney's fees in trademark infringement cases *only* in extenuating circumstances. Here, there are no such extenuating circumstances which would preclude the award of attorney's fees. This court finds that defendants are entitled to attorney's fees relating *only* to the time expended on the issue of wrongful seizure.

Although the seizure was properly applied for and ordered, it was performed in a manner which was unacceptable. *Ex parte* seizures are dangerous weapons, which, if not carried out with utmost care and restraint create a potential for great abuse. They must be extremely limited in scope and seizures which go beyond such limits must be deemed wrongful, entitling defendant to relief under section 1116(d)(11).

### Conclusion

This court finds that defendants violated 15 U.S.C. § 1125(a) and committed the tort of unfair competition. It also finds that plaintiffs performed a wrongful seizure at Speicher, Inc. on May 1, 1987. It is now ORDERED that defendants Speicher and Speicher, Inc. be enjoined from using any G.E. or Carboloy trademarks without explicit permission from G.E. or Carboloy, Inc. It is further ORDERED that plaintiff General Electric Co. (not Carboloy, Inc.) compensate defendants for the wrongful seizure by paying defendants' reasonable attorney's fees incurred in pursuit of their counterclaim in the amount specified by defendants to be filed with this court within thirty (30) days of the date of this order. In addition, General Electric Co. is ORDERED to pay Speicher, Inc. $1,100.00 in damages for the wrongful seizure. It is further ORDERED that General Electric Co. return to Speicher, Inc. any photo-graphs, negatives, or other materials (not including, however, materials bearing genuine G.E. trademarks) seized on May 1, 1987, which it still retains within fifteen (15) days of the date of this order. Speicher and Speicher, Inc. are hereby GRANTED leave to file reasonable attorney's fees incurred in litigating the counterclaim PROVIDED such fees are filed with this court within thirty (30) days of this order. If a detailed request for such fees is not submitted within that time, defendant shall waive such award. All statutory and Rule 54(d) costs are to be assessed against the plaintiffs. Judgment shall enter accordingly. IT IS SO ORDERED.