**GENERAL ELECTRIC COMPANY and Carboloy, Inc., Plaintiffs–Appellants,**

v.

**Robert SPEICHER and Speicher, Inc., Defendants–Appellees.**

No. 88–1730.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1988.

Decided June 8, 1989.

As Amended June 29, 1989.

---

Eric C. Cohen (argued), Donald L. Welsh, Robert B. Breisblatt, Laurie A. Haynie, Welsh, Katz, Ltd., Chicago, Ill., for plaintiffs-appellants.

Albert L. Jeffers, Jeffers Hoffman & Niewyk, Fort Wayne, Ind., for defendants-appellees.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and WILL, Senior District Judge.*

POSNER, Circuit Judge.

This is an appeal by a disappointed plaintiff, General Electric, in a suit for trademark infringement. After a two-day bench trial Judge Sharp awarded General Electric an injunction, but no damages; instead he awarded damages of $1,100 to the defendant, Robert Speicher, on Speicher's counterclaim for wrongful seizure. 676 F.Supp. 1421, motion to reconsider denied, 681 F.Supp. 1337 (N.D.Ind.1988). Actually, there is another plaintiff (the company to which General Electric sold the division that made the trademarked product), and another defendant (Speicher's corporation), but we ignore them to streamline the opinion.

Speicher, an Indianan, is engaged in the business of fabricating inserts for industrial cutting tools; the insert is the cutting edge of the tool. Inserts are made from preformed carbide substrates, which Speicher grinds to the customer's specifica-

---

* Hon. Hubert L. Will of the Northern District of Illinois, sitting by designation.

tions. Speicher's is a modest business, with annual sales of only about $1 million. General Electric is, of course, a giant corporation. Among its many manufactures is a high-quality insert known as the "Carboloy 570," or "570"; these terms are conceded to be valid, although not registered, trademarks. The substrate used to make the insert is called an "866"; when coated in accordance with a secret formula of General Electric, it becomes a finished insert, the GE 570.

Late in 1984 the Chrysler transmission factory in Kokomo, Indiana, invited Tools and Abrasives, Inc. (T & A), an industrial distributor, to quote it a price for supplying GE 570 inserts to Chrysler. T & A obtained a price quotation from General Electric which it passed on to Chrysler, but Chrysler rejected this price as too high. When early in 1985 Chrysler again requested such a quotation, T & A turned to Speicher, who quoted a price less than one-quarter of General Electric's. T & A passed the quotation on to Chrysler without indicating its source, and Chrysler accepted the bid. Although T & A had requested Speicher to bid on GE 570 inserts—a trademarked General Electric product—and although T & A had sent Speicher a Chrysler purchase order that specified "Grade 570" and added "NO OTHER EQUIVALENT," Speicher neither supplied 570 inserts nor tried to make them out of 866 substrates. He used a different substrate, and had it coated by a coating company that did not have access to GE's secret formula. T & A supplied Speicher with empty GE boxes, as it was able to do because it was an authorized GE distributor. Speicher put the inserts into the GE boxes and shipped them to T & A, which in turn shipped them to Chrysler. After a while T & A even asked Speicher to etch "570" on each insert, which he dutifully did. He also stamped "570" on the boxes. We emphasize that the evidence that T & A inspired or even connived in the infringement of GE's trademarks comes entirely from Speicher. GE did not name T & A as a defendant.

After some months Chrysler began to smell a rat. The Speicher 570s were wearing out too fast. Metallurgical testing confirmed that they were phony. Graham, the Chrysler engineer who had placed the order with T & A, complained to T & A, which informed him that the inserts had come from Speicher. Graham was surprised. He thought the inserts had come from General Electric because he knew that fabricators did not have access to General Electric's proprietary insert. He called Speicher, who told him (falsely) that the inserts were genuine 570s. By this time Speicher had shipped some 6,000 inserts to Chrysler and had been paid the full purchase price—some $25,000. It is uncontested that until Chrysler received its metallurgist's report in February 1987, it had no idea that the Speicher inserts were other than genuine GE 570s.

General Electric brought this suit in April 1987. Six days after it was filed, the district judge issued an ex parte order pursuant to 15 U.S.C. § 1116(d)(1)(A), which provides that "with respect to a violation [of federal trademark law] that consists of using a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services, the court may, upon ex parte application, grant an order ... providing for the seizure of goods and counterfeit marks involved in such violation and the means of making such marks, and records documenting the manufacture, sale, or receipt of things involved in such violation." The order authorized the seizure of, among other things, "all simulations, reproductions, counterfeits, copies or colorable imitations of General Electric's trademarks, including any and all cutting inserts bearing reproductions of any of General Electric's trademarks including the designation 570," plus "all books, records or documents of any kind in defendants' possession, custody or control which relate to said simulations [etc.] ... or which relate to [the defendants'] sale, offering for sale, [etc.] ... of any product bearing any General Electric trademark, or any customer and supplier lists."

By representing that the inserts he shipped to T & A for reshipment to Chrysler were GE 570 inserts, Speicher in-

fringed General Electric's registered "GE" trademark and unregistered "570" trademark, in violation of 15 U.S.C. § 1125(a), which so far as relevant to this case forbids any person to "use in connection with any goods ... any false description or representation." This much is conceded, and requires no further discussion. The district judge found, however, that Speicher had not violated another provision of the trademark statute, 15 U.S.C. § 1114(1)(a), which forbids the use of any "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale ... of any goods [where] such use is likely to cause confusion ... or to deceive." Since the 570 is unregistered, section 1114(1)(a) was violated only if Speicher's act of placing non-General Electric inserts in boxes that General Electric had stamped with its registered "GE" trademark qualifies as a "reproduction, counterfeiting [the parties' preferred word], copy, or colorable imitation" of that mark. Since the mark had been placed on the boxes by General Electric, it was not a counterfeit in the literal sense, although Speicher was not authorized to use it in connection with inserts not manufactured by General Electric. The district judge concluded that it was not a "counterfeit" within the meaning of section 1114(1)(a), either.

We disagree. The literal sense might be the correct one if section 1114(1)(a) were aimed just at "counterfeiting." But as the words "reproduction," "copy," and "colorable imitation" suggest more clearly than "counterfeiting," the aim is broader: to prohibit the use of your trademark on someone else's product without your authorization. The usual violator of this prohibition copies, reproduces, imitates—or if you will "counterfeits"—the trademark. See, e.g., *Louis Vuitton S.A. v. Pun Yang Lee*, 875 F.2d 584 (7th Cir.1989). He doesn't *have* the genuine trademark; if he did he wouldn't be an infringer—ordinarily. Sometimes, however, he has the genuine trademark but is an infringer for using it. The most common cases involve distributors. A distributor licensed to sell a trademarked product may decide to sell another product in the trademarked containers in which he received the trademarked product from his supplier. (This has long been a problem in the retail gasoline business. See, e.g., *Prest–O–Lite Co. v. Avery Lighting Co.*, 161 F. 648 (C.C.N.D.N.Y.1908); *Lippo v. Mobil Oil Corp.*, 776 F.2d 706 (7th Cir. 1985).) Or the distributor's trademark license may have expired, and rather than ceasing to use the trademark or returning the trademarked items to his supplier or otherwise complying with the terms of the license, the ex-licensee may continue to use the trademark. Two circuits have held that such trademark abuses (which are very old, see, e.g., *Evans v. Von Laer*, 32 F. 153 (C.C.D.Mass.1887)) violate section 1114(1)(a). See *Burger–King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir.1983); *El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir. 1986); *Franchised Stores of New York, Inc. v. Winter*, 394 F.2d 664, 668 (2d Cir. 1968). District courts in other circuits have reached the same conclusion. See, e.g., *Mobil Oil Corp. v. Auto–Brite Car Wash, Inc.*, 615 F.Supp. 628, 631 (D.Mass.1984); *Pacific & Southern Co. v. Satellite Broadcast Networks, Inc.*, 694 F.Supp. 1565, 1573–75 (N.D.Ga.1988).

■ These decisions are sensible, and their application to this case clear. Speicher used GE's registered trademark, stamped on boxes supplied to him by T & A, in connection with goods that were not GE goods. We can see no difference, so far as the objectives of section 1114(1)(a) are concerned, between doing this and making a reproduction of GE's trademark. The happenstance of having trademarks made by the owner in one's possession, so that one doesn't have to copy them, has no relevance to the purposes of the statute. Indeed, the danger of confusion is even greater because the "imitation" is not merely colorable, but perfect. The more fundamental point is that the purpose of trademark law is not to guarantee genuine trademarks but to guarantee that every item sold under a trademark is the genuine trademarked product, and not a substitute. Cf. *Fendi S.A.S. de Paola Fendi e Sorelle*, 642 F.Supp. 1143 (S.D.N.Y.1986) (authoriz-

ing destruction of the infringing goods). "A 'trademark' is not that which is infringed. What is infringed is the right of the public to be free of confusion and the synonymous right of a trademark owner to control his product's reputation." *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir.1976). The only function of a trademark is to designate a product or service, and the misconduct at which section 1114 is aimed consists not in making the trademark without authorization but in affixing it to the wrong product; it is a detail whether the trademark was stolen from the manufacturer or merely copied.

We move to the remedy for the infringement of General Electric's trademarks. Section 35(a) of the trademark statute provides that a plaintiff who has proved infringement of a registered mark "shall be entitled, ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.... In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.... The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Although this section applies in terms only to the infringement of registered marks, we held in *Nupulse, Inc. v. Schlueter Co.*, 853 F.2d 545 (7th Cir. 1988), that it is also applicable to the infringement of unregistered marks challenged under 15 U.S.C. § 1125. Speicher was found to have violated section 1125 by infringing GE's registered and unregistered trademarks, as well as to have violated section 1114 by infringing its registered trademark, and he does not contest his liability under section 1125.

Without even considering whether General Electric had sustained any damages, Judge Sharp found that "the equities of this case preclude a monetary award. Speicher was an innocent infringer who acted in good faith. Speicher is a reputable businessman who has always enjoyed a spotless business record. The infringe-

ment was confined to one particular job. Speicher's profit [$1,500] and G.E.'s alleged loss [roughly $25,000] are relatively small." 676 F.Supp. at 1432. Naturally the judge also declined to award attorney's fees to GE.

Section 1117(a) does provide that any monetary award under it shall be "subject to the principles of equity," and courts sometimes speak in broad terms about "the award for damages" under the statute being " 'subject to the principles of equity,' " *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 706 (2d Cir.1970), or about "all monetary recovery under § 35 be[ing] 'subject to the principles of equity.' " *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 111 (2d Cir.1988). In these and all the other cases we have found, however, including the leader of the pack, *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947), the issue was whether to award the plaintiff the defendant's profits from the infringement (or in *Getty*, punitive damages), rather than whether merely to make good the plaintiff's losses. See also *Consumers Petroleum Co. v. Consumers Co. of Illinois*, 169 F.2d 153, 163–64 (7th Cir.1947); *Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 642 (D.C.Cir.1982) (per curiam); *Nalpac, Ltd. v. Corning Glass Works*, 784 F.2d 752 (6th Cir.1986). If the defendant is a more efficient producer than the plaintiff, his profits will exceed the plaintiff's losses, so an automatic award of profits in a trademark infringement case could confer a windfall on the plaintiff. This is fine if the defendant is a deliberate infringer, but questionable if he is an innocent one. (An intermediate case will be considered later.) Yet even if he is an innocent infringer he ought at least reimburse the plaintiff's losses. As between plaintiff and defendant, the defendant has violated the law and the plaintiff not, so it is hard to see how the defendant's equities could ever be superior to the plaintiff's if all the plaintiff were seeking was his actual losses. We have found no authority (with the exception of another recent district court decision, reversed in *Louis Vuitton*

*S.A. v. Pun Yang Lee, supra*) for cutting down the plaintiff's recovery on equitable grounds in such a case, and, as explained in the *Lee* opinion we doubt that such a reduction would ever be justified. 875 F.2d at 588–89.

■ General Electric argues that Judge Sharp's finding that Speicher was an innocent infringer under section 1114(1)(a) is clearly erroneous. The argument may seem beside the point, given what we have just said—that even the victim of an innocent infringer is entitled to simple damages, as distinct from the infringer's profits; General Electric is seeking to recover its losses, not Speicher's profits (which were smaller). But the argument is pertinent to GE's requests for attorney's fees and treble damages.

■ The judge's finding that Speicher was an innocent infringer depends to a significant degree on his choice to credit Speicher's testimony. Determinations of credibility are usually unreviewable, but Speicher's testimony is *exceedingly* implausible. And even if we accepted Judge Sharp's conclusion that Speicher actually believed that General Electric acting through T & A had authorized him to grind non-GE inserts and etch "570" on them and ship them in General Electric boxes (but why on earth *would* General Electric authorize this?), this would not make him an "innocent infringer." This is apparent from two items of evidence—one uncontested, the other unremarked by Judge Sharp. The uncontested item is that Speicher was supplying an *inferior* insert masquerading as a 570. As an experienced fabricator he *had* to know that this would cause trouble for Chrysler. True, the Speicher inserts were cheaper as well as less durable, but if Chrysler had wanted cheap nondurable inserts it would not have specified GE 570s (and no equivalents) in its request for bids. Even if Speicher thought that T & A as General Electric's agent had authorized him to substitute another insert for the 570, he could not have thought—and he did not testify that he thought, nor did the judge find that he thought—that he was authorized to substitute an insert that would wear out faster than a 570.

The evidence unremarked by Judge Sharp is the uncontradicted testimony of Chrysler's engineer, Graham, that Speicher had told him that the insert he was supplying Chrysler was a genuine 570. This lie (which Speicher did not deny having made —he only denied *remembering* having made it) was inconsistent with innocent infringement. Judge Sharp's failure to comment on this important testimony makes it impossible for us, given the other circumstances we have recited, to uphold his finding that Speicher was an innocent infringer.

The judge's ruling on damages was further flawed by his unexamined and erroneous premise that even compensatory damages are improper if the defendant infringed the plaintiff's trademark in good faith. Apart from what we said earlier on this score, notice that all that good faith means in this context is that the infringer didn't *know* he was infringing someone's trademark. This means rather little. Suppose that the infringer, although acting in good faith, was also acting negligently—a reasonable person in his position would have realized he was infringing, though he, being unreasonable, did not. Speicher was at least negligent, and probably grossly negligent or even reckless, in believing (if he did believe) that General Electric had authorized him to etch "570" on any old insert he decided to supply. Elementary prudence should have sparked inquiry on his part. After all, he was not dealing with General Electric directly but with T & A, which according to his own testimony was asking him to do some extremely strange things calculated to harm General Electric's reputation as well as take business from it. Speicher was not an innocent infringer in the sense of a blameless one, and even if he had been, this would not in our judgment have excused him from making good General Electric's actual losses.

■ The district court stressed not only Speicher's good faith but also his reputation in the community as a reputable businessman and the smallness of his prof-

its and GE's losses. These facts are irrelevant to the question whether damages should be awarded (and Speicher's good faith has not been shown). Small local businessmen of good repute do not have a license to steal trademarks from large nonresident corporations, and the amount of harm that the infringer inflicts goes to the amount of damages rather than to his liability for damages; the trademark laws do not excuse modest infringements by petty pirates. See *Louis Vuitton S.A. v. Pun Yang Lee, supra,* 875 F.2d at 589.

General Electric is entitled to a new trial on damages. That new trial will encompass its claim under 15 U.S.C. § 1117(b) for treble damages. Added in 1984, this subsection provides that in assessing damages "the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 1114(1)(A) ... that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark." Judge Sharp refused to invoke this provision because he had just refused to award General Electric any damages under section 1117(a), so there was nothing to treble; but on reconsideration he added that he didn't think Speicher had been guilty of intentional misconduct. See 681 F.Supp. at 1344. Whether Speicher's counterfeiting was intentional within the meaning of section 1117(b) is not foreclosed by the district judge's inadequate analysis of the issue of Speicher's good faith. This, together with the question whether there were any extenuating circumstances for his conduct, is a matter to be determined in the new trial that we are ordering on remand. We note that all of the infringing acts occurred after October 12, 1984, the effective date of section 1117(b), held not retroactive in *Louis Vuitton S.A. v. Spencer Handbags Corp.,* 765 F.2d 966 (2d Cir.1985).

Other remedial issues must abide the outcome of the retrial. These include the issue of attorney's fees, on which see *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 746–47 (7th Cir.1985);

*Bittner v. Sadoff & Rudoy Industries,* 728 F.2d 820, 828 (7th Cir.1984) (dictum); the issue of prejudgment interest; and the issue of costs. Judge Sharp ruled—erroneously we might add—that General Electric was not the prevailing party because it had lost on several counts, and therefore would not be awarded costs under Rule 54(d). He did not mention the costs provision in section 1117(a).

■ The next issue is the seizure order. The statute provides damages for wrongful seizure. See 15 U.S.C. § 1116(d)(11). Speicher claimed that General Electric had exceeded the scope of the order by seizing items that were not counterfeit, by seizing items not mentioned in the order, and by taking photographs. The judge agreed, noting in addition that "many of the items seized had no connection with G.E. trademarks. For example, substrates bearing numbers other than '570' were seized. Also, documents having nothing to do with G.E. trademarks were seized.... Perhaps worst of all, the items seized were not placed in this court's custody as required by section 1116(d)(7), but retained by plaintiff. This was and is totally unacceptable." 676 F.Supp. at 1435. The judge forgot that he himself had signed an order authorizing General Electric's counsel to retain the seized items. On reconsideration he acknowledged this and other mistakes in his analysis, yet reaffirmed his decision that General Electric had violated the seizure order because the items seized were not "counterfeits of registered trademarks ... [but rather] genuine articles and *possibly* copies of unregistered trademarks," 681 F.Supp. at 1342 (emphasis in original), and must pay the full damages he had originally assessed even though the error he had found to be most egregious—that relating to custody—was his own.

We quoted the key provisions of the seizure order at the beginning of our opinion. The order is extraordinarily broad, and there is not a single item seized that we can say was not within its scope. It was not limited to counterfeit trademarks (however "counterfeit" be defined) or to the 570 mark, and thus clearly embraces the GE

boxes; nor does the order exclude the seizure of confidential business documents—all of which, by the way, were retained by General Electric's law firm and not shown to General Electric. It is true that the order did not authorize the taking of photographs, but everything that was photographed could have been seized, so we don't see how the taking of the photographs could have violated the spirit of the order or, more important, how Speicher could have been hurt and obtain damages. It is also true that the seizure statute does not apply to unregistered marks as such, but since Speicher's purpose in counterfeiting General Electric's registered mark was to infringe its unregistered mark (the 570), the inserts that bore the 570 mark and were seized were "goods and counterfeit marks involved in such violation," and it therefore was not wrongful to seize them too. We are baffled by Judge Sharp's interpretation of his order and his award of damages for its violation, as we are by much else in his opinion.

■ Last, we note that Speicher's motion under Fed.R.App.P. 38 for sanctions against General Electric for filing a frivolous appeal is itself frivolous and sanctionable. See *Foy v. First National Bank*, 868 F.2d 251, 258 (7th Cir.1989). Far from appealing frivolously, General Electric's appeal has overwhelming merit.

The order awarding damages to Speicher is vacated with instructions to dismiss the counterclaim. The case is remanded for a new trial, to be held before a different district judge (see Circuit Rule 36), on the issue of damages for Speicher's violations of 15 U.S.C. §§ 1114(1)(a) and 1125(a). General Electric is directed to submit to the Clerk of this Court within fifteen (15) days a statement of its expenses in defending against Speicher's frivolous Rule 38 motion.

REVERSED AND REMANDED, WITH DIRECTIONS AND SANCTIONS.

WILL, Senior District Judge, concurring.

While I concur in the majority's conclusions that the award of damages on the defendants' counterclaim be set aside, that the counterclaim be dismissed and that the case be remanded for a new trial, I find myself in disagreement both with some of their factual determinations and with their sharp criticism of Judge Sharp's decision. Since both may impact the retrial of the case, I feel impelled to explain my reasons.

First, the majority asserts that G.E.'s loss was "roughly $25,000." Speicher's total sales price for the approximately 6,500 units in question was $25,000 on which he had a profit of $1,500. G.E.'s loss was at most the profit it would have realized on the approximately 6,500 units had it sold them to Chrysler. A G.E. employee, Luciano Navocco, testified at trial that G.E. would have made $25,000 above cost on the parts, but it is not clear from the testimony that this amount is equivalent to profit or whether some portion of G.E.'s overhead should be subtracted from it. Moreover, it is by no means certain that Chrysler would have purchased the G.E. inserts at the price quoted or at all, since it had already turned them down at the price quoted T & A by G.E.

Second, the majority places the entire blame for the infringement here on Speicher, ignoring almost entirely the evidence that T & A was the principal instigator as well as the principal beneficiary of the episode. It was T & A who was interested in selling G.E. inserts to Chrysler and obtained a quotation from G.E. When Chrysler turned down T & A's bid based on that quotation, T & A contacted Speicher who quoted a much lower price for his inserts than G.E. but one on which T & A's commission or profit was double what it would have been on the G.E. inserts.

It is undisputed that T & A knew Speicher was a small fabricator of cutting inserts and not a dealer in G.E. parts. In addition, given the substantial difference in price between the G.E. and Speicher quotes, there is no way T & A could have believed Speicher was going to supply genuine G.E. parts. It was also T & A which went back to Chrysler with the Speicher price and obtained the order for 6,500 units based on that price. Moreover, Carol Jean Betz, a

former T & A employee, testified at trial that T & A provided Speicher with G.E. boxes, the boxes which Speicher testified he used to package his inserts. Ned Ellis, the General Manager of T & A, testified that there came a time when T & A asked Speicher to etch the code number "570" on each insert.

As this testimony shows, the evidence that T & A inspired or connived in the infringement did not come entirely from Mr. Speicher, as the majority indicates. Mr. Speicher's testimony was corroborated by T & A present and former employees and is consistent with the circumstantial evidence that T & A made higher profits on the sale of Speicher parts than on G.E. parts. The majority finds Speicher's testimony regarding his belief that he was authorized to make and package 570s "*exceedingly* implausible." Obviously, I do not. I agree, however, that Speicher was nevertheless an infringer though probably not a "wilful" one which is relevant to the questions both of damages and attorney's fees.

The majority also lays great emphasis on the uncontested fact that Speicher's inserts were inferior to G.E.'s and asserts that he "*had* to know" this would cause trouble for Chrysler. While it is clear that Speicher's inserts as used by Chrysler did not perform as long as the G.E. inserts, the record does not support the conclusion, although it may be true, that Speicher knew how they were to be used and that they would not last as long or that Chrysler, given their substantially cheaper price, would nevertheless object.

All of these facts as well as other evidence as to T & A's role in the episode must, I believe, be considered on a retrial before the proper measure of damages can be determined and I trust the trier of fact will not conclude that this court has already foreclosed consideration of any of them.

The majority suggests that it is "baffled" by much of Judge Sharp's opinion. While his ultimate decision was, I agree, erroneous, I am not baffled by it. Section 35(a) of the trademark statute provides, as

the majority recognizes, that "subject to the principles of equity" the owner of a trademark which has been infringed is entitled to certain damages. Judge Sharp, in applying equitable principles, ignored the facts that Speicher should, under all the circumstances, have know that his inserts were being passed off to Chrysler as G.E. 570 inserts and that Speicher apparently told a Chrysler representative he was supplying genuine G.E. parts. On the other hand, there was considerable evidence that T & A was the key player in the infringement and its principal beneficiary. It received $2.00 per Speicher insert. Speicher's profit was less than 25 cents per insert. T & A brought Speicher into the transaction. In spite of its testimony to the contrary, T & A must have suspected that Speicher could not have supplied genuine G.E. parts at the quoted prices. Moreover, the evidence at trial showed that T & A asked him to etch "570" on each insert, and furnished him with the G.E. boxes.

What really baffles me, and I trust on retrial will be explored, is why T & A is not a party here. There are, of course, a number of possibilities. T & A may be bankrupt. It may have settled separately with G.E. or may not have been pursued either by G.E. or Speicher for business or other reasons. In any event, T & A's role is relevant to the nature of Speicher's infringement and the damages which should be assessed.

Accordingly, I agree the case should be reversed and remanded for a new trial but with no predetermination as to the facts or condemnation of Judge Sharp.