**ALEXANDER BINZEL CORPORATION,**
**Plaintiff,**

v.

**NU–TECSYS CORPORATION and Karl–Heinz Binzel, Defendants.**

**No. 91 C 2092.**

United States District Court,
N.D. Illinois, E.D.

Jan. 23, 1992.

Daniel W. Vittum, Jr., P.C., Gregory J. Smith, Rhett R. Dennerline, Kirkland & Ellis, Chicago, Ill., for defendants.

John S. Mortimer, J. Ray Wood, Wood, Phillips, Mason, Recktenwald & Vansanten, Chicago, Ill., for plaintiff; Randall G. Litton, Terence J. Linn, James E. Bartek, Price, Heneveld, Cooper, DeWitt & Litton, Grand Rapids, Mich., of counsel.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Plaintiff Alexander Binzel Corp. ("Binzel") brought this action against defendants Nu–Tecsys Corp. ("Nu–Tecsys") and Karl Heinz Binzel alleging trademark and trade dress infringement. The magistrate judge recommended that Binzel's motion for preliminary injunction be granted in part. After a careful review of the facts and for the reasons set forth herein, Binzel's motion for preliminary injunction is denied.

## FACTS

Binzel is the exclusive authorized United States distributor and assembler of genuine Binzel welding equipment manufactured by Alexander Binzel GmbH of Cologne, Germany ("Binzel Germany"). Binzel Germany owns United States trademarks for the Binzel logo and the Binzel name. At least in Europe, Binzel Germany has sold unmarked products for a number of years. This practice continues to date. Karl–Heinz Binzel, a former officer and stockholder of Binzel, is president and owner of defendant Nu–Tecsys. Nu–Tecsys has commenced selling various Metallic Inert Gas ("MIG") welding equipment consisting of "virtually identical copies of both Binzel red-handled and blue-handled MIG welding guns." (Complaint, ¶ 19.) Some of the MIG welding equipment distributed by Nu–Tecsys and sold under the Nu–Tecsys name and in Nu–Tecsys packaging "bears the Binzel product trade dress, the Binzel trademark and/or the Binzel logo." [1] (Complaint, ¶ 20.)

On Binzel's motion for preliminary injunction, the magistrate judge issued a report and recommendation of August 20, 1991 ("Report") recommending that defendants be enjoined from using trademarked Binzel parts as components of their products, but denying other aspects of the requested injunctive relief. The parties have objected to various aspects of the Report. Those objections are discussed below.

## DISCUSSION

### I. TRADE DRESS CLAIM

Plaintiff Binzel objects to the magistrate judge's report and recommendation insofar as it recommends denial of a preliminary injunction against trade dress infringement. Binzel's trade dress infringement is

---

**1.** Other facts are adequately outlined in the magistrate judge's report and recommendation of August 20, 1991 and need not be repeated here.

brought under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Section 43(a) imposes liability on any person who, "on or in connection with any goods ... uses ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion ... or to deceive." Binzel disputes the magistrate judge's finding that Binzel has failed to establish secondary meaning for the trade dress in issue. Specifically, Binzel argues that the findings of intentional copying and substantial promotional efforts demonstrate a likelihood of secondary meaning.

■■■ Proof of trade dress infringement requires a showing that, *inter alia*, the plaintiff's trade dress is inherently distinctive or has acquired secondary meaning. *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935 (7th Cir.1989). Binzel does not contend that its trade dress is inherently distinctive, but that it has acquired secondary meaning. Secondary meaning requires that the public associates the dress with a single source. *Id.* at 936. The magistrate judge found this "single source" requirement unsatisfied by Binzel's trade dress claim. *See* Report at 60 (The "fatal weakness in [Binzel's] trade dress claim is its failure to provide evidence that consumers associated the trade dress of its MIG guns with a single source, the Binzel companies.") This court agrees with the magistrate judge on this point.

■■ The factual findings by the court below reveal that the Nu–Tecsys handles were actually purchased from Binzel and Binzel affiliates. (Report at ¶¶ 39–46; *see* Defendants' Ex. 27–30: invoices of sales to Nu–Tecsys from Binzel affiliates.) The magistrate judge determined that "defendants have deliberately copied the Binzel trade dress and used genuine Binzel components on Nu–Tecsys' MIG guns in order to create the impression that Nu–Tecsys' MIG guns are genuine Binzel products." (Report at ¶ 93.) The court shares defendants' confusion over the magistrate judge's conclusion that defendants intentionally copied the Binzel trade dress. The fact that the MIG handles, the subject of the trade dress, were purchased from Binzel and its affiliates vitiates Binzel's allegations of intentional copying. The sale of these handles by Binzel companies to Nu–Tecsys demonstrates a willingness and implies an authorization by Binzel to permit Nu–Tecsys to use Binzel handles in its business. Binzel cannot now charge that handles legitimately purchased by Nu–Tecsys cannot be used by Nu–Tecsys without fearing allegations of deliberate copying. Moreover, even if such sales have ceased since February 1990, Binzel has not established that its trade dress has developed secondary meaning in the short time since February 1990.

Binzel also sells welding guns to a number of customers who then resell them under private labels. (Report at ¶¶ 36, 61.) One of those arrangements involves a MIG gun having a black handle with the same configuration as the red handle used by Nu–Tecsys. An Illinois appellate court explained the harm that private labeling has on a plaintiff's attempt to establish secondary meaning:

> [W]e are aware of [no authority] which has held that a secondary meaning can be established when a plaintiff permits those who distribute his product and use his package to apply their own proprietary labels to it and therefore lead the consumer to believe the product is not the plaintiff's but that of another in whose store the product is sold. Rather the rule is to the contrary. A plaintiff who would enjoin others from imitation under trademark and unfair competition laws should not himself be guilty of misrepresenting the source of his own article.

*Filter Dynamics Int'l, Inc. v. Astron Battery, Inc.*, 19 Ill.App.3d 299, 311 N.E.2d 386, 395 (2d Dist.1974). The court agrees with this reasoning.

Binzel has demonstrated a willingness to allow consumers to associate the trade dress of its MIG handles with more than one source. Binzel's sales of MIG handles to Nu–Tecsys and to companies that sell MIG guns under private labels impair Binzel's ability to establish that consumers associate the trade dress of Binzel MIG

guns with a single source, the Binzel companies.

Furthermore, the magistrate judge apparently found that Binzel could not demonstrate that its substantial promotional efforts were successful enough to establish secondary meaning. (Report at 38.) *See Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264, 1270 (7th Cir.1989) ("it is the effect or success of the advertising, not the mere fact of advertising, that is the test of secondary meaning").

■ Binzel also argues that the magistrate judge should have recommended entry of preliminary injunction on the trade dress issue under the Illinois Uniform Deceptive Trade Practices Act (the "Illinois Act"), Ill.Ann.Stat. ch. 121½, ¶ 311. Under the Illinois Act, the issue of intentional copying presents an obstacle to establishing secondary meaning for the same reasons as discussed above. Moreover, Binzel's private label sales defeat its claim of secondary meaning. *See Filter Dynamics Int'l*, 311 N.E.2d at 395.

For these reasons, the court finds no sufficient basis to disturb the magistrate judge's finding that there is a minimal likelihood of establishing secondary meaning for Binzel's trade dress. The court finds that Binzel has failed to demonstrate that the likelihood of success on the merits of its trade dress claim under either the Lanham Act or the Illinois Act is better than negligible.

## II. TRADEMARK CLAIM

Binzel brought its claim of trademark infringement under §§ 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a). Section 32(1)(a) forbids the use of any "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale ... of any goods [where] such use is likely to cause confusion ... or to deceive."

■ In granting Binzel's motion for a preliminary injunction regarding the trademark claim, the magistrate judge found that defendants' use of small consumable genuine Binzel parts bearing genuine Binzel trademarks as components of an otherwise unmarked product states a claim of trademark infringement. (Report at p. 45.) This court believes that the magistrate judge's evaluation of this issue was in error.

The magistrate judge relied on *General Electric Co. v. Speicher*, 877 F.2d 531, 534 (7th Cir.1989), for the proposition that a person having possession of a genuine trademark may still be an infringer for using it. The court in *General Electric* described two scenarios that exemplify this proposition, both involving distributors:

> A distributor licensed to sell a trademarked product may decide to sell another product in the trademarked containers in which he received the trademarked product from his supplier.... Or the distributor's trademark license may have expired ... [and] ... the ex-licensee may continue to use the trademark.

*Id.* at 534. In *General Electric*, defendant Speicher used plaintiff GE's registered trademark, stamped on boxes supplied to him by a third party, in connection with goods that were not GE goods. *Id.* The district court held that Speicher had not infringed GE's trademark because GE placed its own mark on the boxes, and Speicher had not copied it. *Id.* In reversing the district court and holding that Speicher had infringed GE's trademark, the Seventh Circuit stated that whether a trademark is stolen or copied is irrelevant to the purpose of trademark law—to protect the right of the public to be free of confusion and the synonymous right of a trademark owner to control his product's reputation. *Id.* at 534–35.

Neither the distributorship situations provided by the court in *General Electric* or the facts of that case are analogous to the circumstances in the instant case. There is no evidence that Nu–Tecsys placed its product in Binzel packaging, or continued to use Binzel's trademark after the expiration of a license to do so. Moreover, Nu–Tecsys has not stolen or copied the Binzel trademark, the issues addressed by *General Electric*. To the contrary, Nu–Tecsys legitimately purchased the Binzel

parts from Binzel. Nu–Tecsys' use of the Binzel parts was compatible with and even encouraged by the manner in which Binzel sells its product; the parts are consumable items which Binzel markets throughout the industry.[2] Thus, unlike the situations presented in *General Electric*, Nu–Tecsys' use of Binzel nozzles is fully consistent with Binzel's profit motive as well as the manner Binzel has chosen "to control [its] product's reputation."

With no Seventh Circuit authority on point, the court finds authoritative the case of *Roho, Inc. v. Marquis*, 902 F.2d 356 (5th Cir.1990). In *Roho*, defendant Marquis purchased and removed labels from patented wheelchair cushions manufactured by Roho and used the cushions to copy another Roho product, an unpatented therapeutic mattress. *Id.* at 359. The court found that Marquis' actions did not constitute reverse palming off in violation of section 43(a) of the Lanham Act. *Id.* at 361. The critical comparison, according to the court, was between the product Marquis purchased— the cushions—and the product he ultimately marketed—the mattress. *Id.* at 360.

The court in *Roho* first found that, by making the mattress, Marquis "actually created" a new product by modifying the cushions "in a more than superficial manner by attaching them with the necessary glue and grommets to create a mattress." *Id.* at 360–61. Despite the fact that the Marquis mattress was made of Roho components and regardless of any similarity between the two mattresses, the court stated that the Marquis mattress "is not a Roho product ... and cannot be considered a relabeled Roho mattress." *Id.* at 361. The court was not swayed by the perceived unfairness of this result:

> [W]hile Marquis "procured" [the cushions] from Roho, he paid the price they asked and Roho profited from the sale. If Marquis can buy component parts from Roho and assemble them into a product at a price that is, competitive

with another of Roho's products, that competition serves the public interest. *Id.*

Nu–Tecsys, like Marquis, purchased the component parts from the plaintiff and used those parts to create a product also manufactured by the plaintiff. The welding gun created by Nu–Tecsys using consumable Binzel parts is clearly a distinguishable product from the parts alone. Nu–Tecsys' efforts in manufacturing its guns and packaging it under the Nu–Tecsys label bars any characterization of the guns as relabeled Binzel guns.

The court is aware that the labeling circumstances of *Roho* and this case differ. In *Roho*, Marquis removed the labels from Roho's cushions and then sold the resulting mattress under the Marquis label. *Id.* at 360. Here, Nu–Tecsys maintained the Binzel mark on the components. Elsewhere, the Nu–Tecsys guns lacked any mark identifying Nu–Tecsys as the source of the product. However, the packaging of the Nu–Tecsys guns did identify Nu–Tecsys as the source of the product.

The distinction between the labeling facts in *Roho* and this case does not alter the applicability of the *Roho* analysis to this case. The court in *Roho* did not rely on or even emphasize the labeling of the products in its reasoning. Additionally, Binzel has not demonstrated that consumers of welding guns use the Binzel consumable components on the otherwise unlabeled Nu–Tecsys guns to identify the source of the guns. Moreover, in light of *Roho*, finding infringement by Nu–Tecsys based upon the different labeling situations would render an absurd result: In order for Nu–Tecsys to use the legitimately-purchased parts in its business, Nu–Tecsys would be required to eradicate the Binzel mark which was placed on the parts by Binzel knowing that the parts were being sold to non-Binzel manufacturers.

■ The magistrate judge held that "[e]ven where the components of an alleged infringer's product are genuine, man-

---

2. *See* Defendants' Ex. 122–23 (advertisement in welding industry magazine promoting Binzel products, including supplies); Plaintiff's Ex. 30

(Binzel MIG equipment catalog marketing Binzel products, including accessories and consumables.)

ufacture and sale of the product will infringe unless labeling describes the true relationship of the purchased component to the overall product." (Report at 44.) This court believes that defendants did all that was required of them to diminish customer confusion by packaging their product with the Nu–Tecsys name and logo. It is unsurprising that Binzel cites no authority requiring Nu–Tecsys to eradicate the Binzel mark from the genuine Binzel parts or otherwise label the welding guns with the Nu–Tecsys name or logo.[3] Although Nu–Tecsys procured the components from Binzel, Nu–Tecsys paid the price Binzel asked and Binzel profited from the sale. Binzel cannot now be heard to complain that defendants' use of the trademarked parts constitutes infringement.

For these reasons, the court believes that the magistrate judge erred in finding that Binzel "has made a very strong showing of likelihood of success on its trademark claim." (Report at 48.) Binzel has failed to establish that Nu–Tecsys has used any "reproduction, counterfeit, copy, or colorable imitation of a registered mark" or used "any false description or representation" in connection with any goods.

## CONCLUSION

Plaintiff Binzel's motion for preliminary injunction is DENIED. The case is set for status on February 5, 1992 at 10 a.m. The parties are urged to discuss settlement of this case and to pursue arbitration in Germany as set forth in paragraph six of the termination agreement between Alexander Binzel Corp. and Karl–Heinz Binzel.

---

3. Defendants correctly point out that labeling its welding guns with the Nu–Tecsys trademark would not resolve the source identification problem:

> The Magistrate creates a catch–22 for Nu–Tecsys by reasoning that even if Nu–Tecsys had put its own trademark on its MIG guns, that would only add to the confusion because

consumers would then conclude that Nu–Tecsys is a licensee of [Binzel]. Thus, once Binzel sold trademarked parts to Nu–Tecsys ..., there was nothing Nu–Tecsys could do to avoid trademark infringement under the Magistrate's analysis.

(Defendant's Objections, p. 2.)