**HARLEY–DAVIDSON, INC., Plaintiff,**

v.

**SELECTRA INTERNATIONAL DESIGNS, LTD.,**
**Defendant.**

Civ. A. No. 93–C–0302.

United States District Court,
E.D. Wisconsin.

June 15, 1994.

Dyann L. Bumpke, Jonathan H. Margolies, Michael Best & Friedrich, Milwaukee, WI, for plaintiff.

Jeffrey E. Jacobson, Jacobson & Colfin, New York City, Alfred R. Mosiello, Bronx, NY, James F. Boyle, Nilles & Nilles, Milwaukee, WI, for defendant.

### DECISION AND ORDER

REYNOLDS, District Judge.

Plaintiff Harley–Davidson, Inc. ("Harley–Davidson"), claims defendant Selectra International Designs, Ltd. ("Selectra"), infringed various Harley–Davidson trademarks and engaged in unfair competition by selling "counterfeit" stickers bearing the trademarks. Both parties have moved for summary judgment. For reasons set forth below, plaintiff's motion will be granted and defendant's denied.

### I. Facts

Harley–Davidson owns a number of registered trademarks which it displays on its motorcycles and other merchandise. Certain other companies are licensed to use the trademarks, but Selectra, which sells vending machines and decals, is not one of them. Nevertheless, from early 1990 through late

1993, Selectra sold stickers bearing images identical to some of the Harley–Davidson trademarks.

Harley–Davidson first discovered Selectra's sale of the stickers in January 1990, when Harley–Davidson's manager of trademark enforcement, William Wood ("Wood"), and its director of trademark licensing, Thomas Parsons ("Parsons"), saw the stickers on display at Selectra's booth at a Chicago trade show. Present at the booth was Selectra's president and owner, Alfred Mosiello ("Mosiello"), who assured the two, before knowing who they were, that the stickers were licensed by Harley–Davidson. When Parsons identified himself and informed Mosiello that the stickers were not licensed (which could be determined by the absence of an "Official Licensed Product Logo"), Mosiello asked if he could obtain a license. He was told that he could not. (Feb. 15, 1994 Pl.St. of Facts ¶ 23;[1] Mar. 9, 1994 Def. Response to Pl.St. of Facts ¶ 3.) The stickers were identified by model numbers A3401 through A3406, and were listed in Selectra's catalogue. (Feb. 15, 1994 Wood Aff., Ex. 22 at 10.)

In a letter dated February 12, 1990, Selectra's general sales manager, Sylvia Montoya ("Montoya"), assured Wood that Selectra would "immediately cease and desist from any sales of infringing merchandise" and that it had a "zero inventory on any items bearing Harley–Davidson trademarks." (Feb. 15, 1994 Wood Aff., Ex. 24.) But in early 1991, Wood discovered that stickers identical in appearance and model numbers to those on display at Selectra's booth at the Chicago trade show were being sold by another company, People's Choice Distributing ("People's Choice"), and that People's Choice had purchased the stickers from Selectra on December 10, 1990, almost a year after the date of Montoya's letter to Wood. (Feb. 15, 1994 Wood Aff., Ex. 27.) Selectra confirms that it sold the stickers after the letter was sent. (Mar. 9, 1994 Def. Response to Pl.St. of Facts ¶ 4; Mar. 9, 1994 Mosiello Aff. ¶ 7.)

At some point during the summer of 1992, Wood found that another company, Dyer International ("Dyer"), was selling disposable cigarette lighters to which it had affixed the very same stickers. (Feb. 15, 1994 Pl.St. of Facts ¶¶ 31, 32;[2] Feb. 15, 1994 Wood Aff., Ex. 28; Mar. 9, 1994 Def. Response to Pl.St. of Facts ¶ 5.) The stickers were purchased from Selectra in June and July, 1992, according to Dyer's invoices from Selectra. (Feb. 15, 1994 Wood Aff., Ex. 28.) In a letter to Wood, a Dyer representative said he was surprised to find that the stickers were not licensed, "since they were on full view and display" at Selectra's booth at a February 1992 trade show in New York. (Id.)

In August 1992, Harley–Davidson representatives purchased more of the same stickers, bearing the same model numbers, from MC Distributors, a company in Canfield, Ohio, to whom Selectra acknowledges selling the stickers. (Feb. 15, 1994 Pl.St. of Facts ¶ 34; Feb. 15, 1994 Wood Aff. ¶ 11, Ex. 29; Mar. 9, 1994 Def.Resp. to Pl.St. of Facts ¶ 7.) Another company to whom Selectra acknowledges selling the stickers is Mr. B's Lifestyle Accessories ("Mr. B's") in New York, from which the stickers were seized in 1993 pursuant to civil seizure proceedings initiated by Harley–Davidson. (Feb. 15, 1994 Pl.St. of Facts ¶¶ 40, 41; Montoya Dep. at 32–34.) Wood asserts that between 1991 and 1993 he has observed more than 200 retail stores throughout the country selling the same stickers, identical in appearance and model number to those shown in Selectra's catalogue, and further asserts that in every instance he identified Selectra as the supplier. (Feb. 15, 1994 Pl.St. of Facts ¶¶ 37, 39 40; Feb. 15, 1994 Wood Aff. ¶ 13.) Selectra denies selling the stickers to that many stores, and denies being the only supplier of the stickers. (Mar. 9, Def.Resp. to Pl.St. of Facts ¶¶ 9, 11.)

In February 1993, at the New York trade show where a Dyer representative had observed Selectra displaying the stickers the year before, Selectra again displayed the

---

1. Selectra offers no evidence in support of its objection to this statement, so the statement is deemed to be undisputed. Fed.R.Civ.P. 56(e); Local Rule 6.05(d) (E.D.Wis.).

2. See note 1, *supra.*

same stickers, identical in appearance and model number to those shown in its catalogue. (Feb. 15, 1994 Pl.St. of Facts ¶ 35; Feb. 15, 1994 Wood Aff. ¶ 12, Exs. 31–33.) When Wood and another Harley–Davidson representative visited Selectra's booth, which was attended by Mosiello and Montoya, they were assured that the stickers were licensed, and they purchased several of them. (Feb. 15, 1994 Pl.St. of Facts ¶ 35; Feb. 15, 1994 Wood Aff. ¶ 12; Mar. 9, 1994 Def.Resp. to Pl.St. of Facts ¶ 7.) Selectra continued selling the stickers until the end of 1993, months after this lawsuit was filed. (Mosiello Dep. at 28.)

Selectra says it purchased the stickers from a close-out company called Close–Outs, U.S.A. ("Close–Outs"), which printed the model numbers A3401 through A3406 on the stickers at Selectra's request, and which always demanded payment in cash. (Mosiello Dep. at 11, 15, 25.) Mosiello says he understood from speaking with a Close–Outs representative, whose name he cannot remember, that Close–Outs obtained the stickers from the Adams Apple Distributing Company ("Adams Apple") and that the stickers were licensed. (Mosiello Dep. at 22–24.) In fact, however, though Adams Apple does sell certain Harley–Davidson merchandise, it does not sell stickers of the kind shown in Selectra's catalogue, and it has never sold anything to Close–Outs or Selectra. (Feb. 15, 1994 Pl.St. of Facts ¶ 50;[3] Feb. 11, 1994 Mittleman Aff. ¶¶ 5, 6; Mar. 9, 1994 Def. Resp. to Pl.St. of Facts ¶ 13.)

After Wood informed Selectra in early 1990 that its stickers infringed Harley–Davidson's trademark and were not licensed, Selectra took no further steps to determine whether the stickers were in fact licensed. (Mosiello Dep. at 45.)

Based on a review of Selectra's invoices from January 2, 1990, through March 31, 1993, a certified public accounting firm retained by Harley–Davidson estimates that Selectra's revenue from sales of merchandise bearing Harley–Davidson trademarks was as follows: $1,329,850 from stickers with model numbers A3401 through A3406; $131,788 from stickers with model numbers T3880 and T3881; and $22,116 from "Eagle Decals" of various sizes, which are not identified by a model number. (Feb. 15, 1994 Pl.St. of Facts ¶ 61; Redlin Aff. ¶¶ 12–14, Ex. B.) These estimates are necessarily imprecise, because Selectra's invoices usually refer to a whole category of stickers, such as "A–Series," which includes a variety of stickers in addition to those bearing the Harley–Davidson trademarks. (Feb. 15, 1994 Redlin Aff., Ex. B at 4, 8, 9.)

Selectra, however, has proposed no alternative method of determining what portion of its sales revenue was derived from the stickers at issue. (Mar. 9, 1994 Def.Resp. to Pl.St. of Facts ¶ 14; Feb. 15, 1994 Bumpke Aff., Ex. 1 ¶ 8.) Furthermore, although Selectra disputes that the revenue estimates accurately reflect its profits from the sale of the stickers, it has failed to adduce any allegations or evidence as to its actual profits or costs. (Feb. 15, 1994 Pl.St. of Facts ¶ 59; Feb. 15, 1994 Bumpke Aff., Ex. 1 ¶¶ 9, 10, Ex. 2 ¶¶ 7, 8; Mar. 9, 1994 Def.Resp. to Pl.St. of Facts ¶ 14.)

Harley–Davidson receives royalties of at least 10 percent on the sale of licensed decals. (Feb. 15, 1994 Wood Aff. ¶ 5.) Thus, based on the revenue estimates noted above, Harley–Davidson estimates that had Selectra's Harley–Davidson stickers been licensed, Harley–Davidson would have received at least $148,375 as a result of their sale. (Feb. 15, 1994 Pl.St. of Facts ¶ 62;[4] Mar. 9, 1994 Def.Resp. to Pl.St. of Facts ¶ 15.) Harley–Davidson further estimates that it spends at least $400,000 a year on trademark enforcement and that it suffered at least $200,000 in damage to its goodwill as a result of Selectra's use of its trademarks. (Feb. 15, 1994 Pl.St. of Facts ¶¶ 63, 64;[5] Mar. 9, 1994 Def. Resp. to Pl.St. of Facts ¶ 15.) Selectra has made no attempt to refute these estimates.

## II.  Analysis

The court must grant a motion for summary judgment if the pleadings, depositions,

---

**3.**  See note 1, *supra.*

**4.**  See note 1, *supra.*

**5.**  See note 1, *supra.*

answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of asserting the absence of any dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To withstand summary judgment, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).

### A. Liability

Harley–Davidson claims that Selectra's sale of stickers bearing Harley–Davidson's trademarks constitutes trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a)(1)(A). The basic elements of both claims are the same: Harley–Davidson must show that its trademarks are "protectable," that Selectra used or imitated them without its consent, and that as a result consumers are likely to confuse Selectra's products for Harley–Davidson's. *Forum Corp. of North America v. Forum, Ltd.*, 903 F.2d 434, 439 (7th Cir.1990); 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A). Selectra raises no dispute as to the first and third of these elements.

As to the second element, Selectra claims it believed, based on the statement of an unnamed employee of Close–Outs, that Close–Outs had purchased the stickers from a licensed distributor, Adams Apple. If the stickers were licensed originally, Selectra contends, it was free to purchase and resell them as long as it did not claim to be an authorized Harley–Davidson agent. *See Osawa & Co. v. B & H Photo*, 589 F.Supp. 1163, 1173–74 (S.D.N.Y.1984). *But see Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.*, 816 F.2d 68, 72–73 (2d Cir. 1987) (holding that resale of goods purchased from licensed distributor may constitute trademark infringement if resale violates territorial restriction in licensing agreement). ■ Assuming this to a valid defense, however, its viability in this case depends on whether the stickers were ever in fact li-

censed. Harley–Davidson insists, and has adduced specific facts showing, that they were not licensed: though Adams Apple is a licensed distributor, its representative says it does not sell stickers of the kind sold by Selectra and has never dealt with Selectra or Close–Outs. It becomes Selectra's burden, therefore, to adduce specific facts contradicting this assertion. Fed.R.Civ.P. 56(e). But Selectra has not done so. Rather, while it has purported to show that it believed the stickers were licensed, it has made no attempt to establish the correctness of this belief. The belief itself is irrelevant to the question of liability (though not, as discussed below, to the question of remedy), because liability for infringement under the Lanham Act is strict. *Hard Rock Cafe Licensing v. Concession Serv.*, 955 F.2d 1143, 1152 n. 6 (7th Cir.1992).

Thus, there being no genuine issue of fact as to whether the stickers were licensed, Selectra's only defense to liability must be rejected as a matter of law.

### B. Remedy

Under Section 35(a) of the Lanham Act, Harley–Davidson is "entitled ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). The same provision sets forth a couple of different ways of determining the proper amount of recovery, and also provides for an award of attorney's fees "in exceptional cases." *Id.* However, if Selectra's violation of the act is found to consist "of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark," the court is required to award triple the amount of the profits or damages determined under Section 35(a), whichever is greater, plus a reasonable attorney's fee, and may award prejudgment interest as well. 15 U.S.C. § 1117(b).

■ The first task, then, is to determine the amount of Selectra's profits to which Harley–Davidson is entitled under Section 35(a). It generally is held, notwithstanding the unqualified language of this section ("the plaintiff shall be entitled"), that an award of

the defendant's profits is not appropriate where the defendant did not mean to infringe. *General Elec. Co. v. Speicher,* 877 F.2d 531, 535 (7th Cir.1989); 2 McCarthy on Trademarks and Unfair Competition §§ 30.25(3) at 91, 30.28(1) at 130 (3d ed. 1992). Selectra's claim to being an "innocent infringer" is based solely on the oral assurances it says it received from the unnamed Close-Outs employee. The undisputed fact, however, is that those assurances, assuming they were ever given, were proved wrong in January 1990, when Parsons, Harley-Davidson's director of trademark licensing, informed Selectra that the stickers were not licensed. It also is undisputed that after receiving this information, Selectra did not attempt to confirm the assurances it says it had received. Thus, during the entire period of infringement for which Harley-Davidson seeks recovery (if not before), Selectra knew it was selling counterfeit stickers. As a matter of law, therefore, Harley-Davidson is entitled to Selectra's profits.

Section 35(a) provides that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). Based on a thorough review of the invoices Selectra issued during the relevant period (January 1990 through March 1993), Harley-Davidson estimates that Selectra sold $1,483,754 worth of stickers bearing Harley-Davidson trademarks. As noted above, this estimate cannot have been made with great precision, because Selectra's invoices were not written with great precision. Nevertheless, Harley-Davidson set forth specific facts supporting its estimate, thus shifting to Selectra the burden of challenging the estimate on the basis of specific facts. Fed.R.Civ.P. 56(e). Instead, Selectra offers only a conclusory objection to the estimate, and the estimate is therefore deemed to be undisputed.

Selectra also has failed to adduce any specific facts, or even any bald allegations, as to its costs. Thus, as the statute gives Selectra the burden of proof on this issue, the court must conclude that Selectra's costs were zero. Under Section 35(a), therefore, Harley-Davidson is entitled to $1,483,754 as the amount of profit Selectra derived from the sale of infringing stickers.

As for the damages it sustained, Harley-Davidson claims it should be awarded $148,375 for the amount of royalties it would have received had Selectra's stickers been sold by a licensed distributor; $200,000 for damage to its goodwill; and an unspecified amount for the cost of trademark enforcement, on which it spends $400,000 a year. Whether Harley-Davidson is in fact entitled to these amounts need not be determined, however, if Section 35(b) applies, for that section requires that the award be based on the greater of the defendant's profits or the plaintiff's damages, and in this case Selectra's profits are greater than the amount of damages Harley-Davidson claims to have sustained.

Again, Section 35(b) applies if Selectra "intentionally" used Harley-Davidson's trademarks "knowing" they were "counterfeit." 15 U.S.C. § 1117(b). There may be some difference between this standard and the degree of bad faith necessary to justify an award of defendant's profits under Section 35(a), *Speicher,* 877 F.2d at 537, but the difference is of no consequence here. As already noted, the undisputed facts show that Selectra knew by January 1990 that the stickers it had been selling were counterfeit, yet it continued to sell the same stickers for more than three years without making any further inquiry into their genuineness. Harley-Davidson has therefore shown as a matter of law that during the relevant period, Selectra sold the stickers knowing them to be counterfeit.

Thus, pursuant to Section 35(b), Harley-Davidson must be awarded three times Selectra's profits, or $4,451,262, plus a reasonable attorney's fee and costs. Harley-Davidson also will be awarded prejudgment interest, for while the statute makes such an award discretionary, the Seventh Circuit makes it "presumptively available." *Gorenstein Enter. v. Quality Care-USA,* 874 F.2d 431, 436 (7th Cir.1989). Finally, although Harley-Davidson's motion for summary judgment does not request a permanent injunction, its complaint does, and under the facts of this case such relief is plainly warranted. *See* 15 U.S.C. § 1116(a).

IT IS THEREFORE ORDERED that Selectra's February 16, 1994 motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that Harley–Davidson's February 15, 1994 motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED that Harley–Davidson shall recover from Selectra $4,451,262, plus prejudgment interest to be calculated in accordance with 15 U.S.C. § 1117(b), as well as costs and a reasonable attorney's fee.

IT IS FURTHER ORDERED that on or before 14 days from the date of this order, Harley–Davidson shall file a motion for attorney's fees and a proposed judgment.